Argued June 24; affirmed September 9; rehearing denied
November 18, 1947

# STATE *v.* HENDERSON

184 P. (2d) 392

*John R. Collier* and *J. Raymond Carskadon*, of Portland, Deputy District Attorneys for Multnomah County (John B. McCourt, of Portland, District Attorney for Multnomah County, on brief), for respondent.

*Walter H. Evans, Jr.,* of Portland (John H. Holloway, of Portland, on brief), for appellant.

*Irvin Goodman,* of Portland, on brief amicus curiae.

ROSSMAN, C. J.

This is an appeal by the defendant from a judgment of the circuit court which found him guilty of the crime of first-degree murder and which ordered his execution. The judgment was based upon a verdict of a jury unaccompanied by recommendation of life imprisonment as permitted by Constitution of Oregon, Art. I, § 37, and § 23-411, O. C. L. A. According to the indictment, one Walter H. Poole was the victim of the homicide.

The appellant submits nine assignments of error which, succinctly stated, follow:

The defendant's motion for a verdict of not guilty should have been sustained.

The defendant's motion to withdraw from the consideration of the jury the question of first-degree murder should have been sustained.

Purported confessions and admissions submitted by the State should have been excluded.

The instructions to the jury should have included that part of § 23-406, O. C. L. A., which says: "If any person shall, in the commission of an unlawful act, * * * involuntarily kill another, such person shall be deemed guilty of manslaughter."

Evidence indicating that the defendant shot one Jerry Taylor a half hour or so prior to the alleged homicide should have been excluded.

Evidence given by one Stanley MacDonald, a witness for the State, concerning tests which he made to determine how far unburned powder is thrown in the firing of a revolver should have been excluded.

Photographs submitted by the State showing wounds upon the body of the deceased should have been excluded.

An instruction concerning the defendant's use of an alias should not have been given.

The trial judge employed the wrong means in substituting an alternate juror for one of the regular ones who became incapacitated.

The deceased was killed late in the evening of December 24, 1945, in Vanport, which is a community immediately adjacent to Portland. His body was discovered by a passerby December 25 at 2:00 p. m. The State claims that his death was caused by a bullet fired by the defendant which pierced the aorta.

When Poole's body was discovered it was lying with the face downward and the right arm folded under the chest. There were several bruises upon the head and one of the shoulders. There was also a bullet hole in his back, another in his chest and two in the upper part of his right arm. The four bullet holes were made by a single missile which entered Poole's body from the back, severed the aorta, left the body through the chest and then went through the right arm. The wounds upon the head, according to the record, were severe

enough to have rendered Poole unconscious. The State contends that after Poole had fallen to the ground from the blows upon his head, the defendant shot him in the back. It claims that before the defendant killed Poole he robbed him of his automobile, watch and ring.

The defendant, who was 25 years of age at the time of the trial, was born in North Carolina. He went to school until he had completed some of the high school grades. After he left school he worked for three years in a cigarette factory and advanced there to the position of assistant inspector. April 4, 1941, he enlisted in the Army and remained in it until March, 1945, when he deserted. At that time he was located at Fort Lewis, near Tacoma. Immediately after his desertion he went to Portland, discarded his uniform and assumed the name of Aaron Robinson, that being the name of his stepfather who lived in Philadelphia.

A half hour or less before Poole's death the defendant had an altercation in a tavern in Vanport with a Negro whose name was Jerry Taylor. The defendant was also a Negro. Poole was a white man. Taylor, like the defendant, was a deserter from the Army. In the course of their wrangle the defendant twice fired a gun which he carried. One of the bullets hit Taylor. At that juncture, according to the State's evidence, the defendant went to his home, which was nearby, hurriedly told his wife of the shooting, quickly gave her a few dollars, told her to return to her parents' home, and said that he was "skipping out." Without gathering up any of his belongings, the defendant walked to the highway which led to Vancouver. When he reached it he saw a man entering an automobile. That individual was the aforementioned Walter H. Poole, a stranger to the defendant. Unbeknown to

Poole, the defendant opened the right-hand door of the car and sat down alongside Poole. The State contends that the defendant, at the point of a gun, directed Poole's driving until a dark parking place was reached. There, according to further contentions of the State, Poole, obedient to the defendant's commands, stopped his car and got out of it. It was at that point, if the State's claims are well founded, that the defendant took Poole's life.

While the defendant was in the charge of military authorities in Philadelphia, pursuant to his surrender to them, he signed four statements in each of which he declared that he struck Poole over the head three times with a pistol immediately after Poole got out of his car. In these four statements he also stated that while the third blow was being struck the gun was discharged. It is these four statements which, in part, constitute the subject of the third assignment of error. The State does not concede that the gun was discharged inadvertently. It disputes that part of the purported confessions. The defendant, in addition to challenging the admissibility of the statements, contends that he never admitted that he struck or shot Poole. He concedes, however, that immediately prior to Poole's death he rode with him in his car and that after Poole's death he possessed his automobile, ring and watch.

After the defendant took Poole's automobile, which was a Chevrolet, he drove it. The car at that time displayed a Washington license plate. The defendant substituted for it an Oregon license plate which he removed from some car. The State contends that he wanted the car so that he could flee from Portland and from possible apprehension for the shooting of Jerry Taylor and for his desertion from the Army. The

State contends that his desire for a car in which to flee caused him to kill Poole.

Immediately after taking Poole's car the defendant drove to Tacoma where he shortly turned around and returned to Portland. Upon returning to Portland he remained only long enough to have some emergency repairs made to the car and then drove east as far as Logan, Iowa, where the car became disabled. By bus and train he made his way to Philadelphia. He arrived there December 30. In the course of a day's visit with his mother he told her that he had become involved in some difficulty in Portland. She and the defendant's stepfather advised the defendant to surrender himself to the Army authorities. He heeded the advice. A week after he had placed himself in the custody of the military authorities he was interviewed by two officers of the Federal Bureau of Investigation and thus was brought about the series of purported confessions and admissions. The defendant at that time possessed a ring and a wrist watch which belonged to Poole.

The defendant swore that he drank heavily on the day of the homicide and claimed that as a result he could remember very little of what occurred Christmas Eve. He, however, recalled that (1) he had an altercation with Taylor and in its course fired his gun twice; (2) after the altercation he went home, mentioned to his wife the shooting and immediately after so doing walked to the highway and saw a man coming from a building and getting into a parked automobile; (3) he got into the same car and rode a distance with that individual and obtained from him his watch, ring and automobile; (4) he got a license plate from another car and placed it upon Poole's car; (5) he picked up someone along the highway as he was driving toward

Tacoma; and (6) "the next thing I recall is letting them drive because I was not able to drive * * * . I went asleep, I know because when I waked up we were between Olympia and Fort Lewis."

Although the defendant claimed that the liquor which he drank rendered it impossible for him to recall events that happened on Christmas Eve, we observe from his testimony that he swore:

"I don't know whether I was drunk or wasn't drunk.

&ast; &ast; &ast;

"Q. How much effect did all that whiskey have on you?

"A. Right now, I couldn't say.

"Q. What is your best recollection? Were you drunk?

"A. Well—I don't know whether I was drunk or not."

The defendant and Jerry Taylor met in January, 1945, while the two were stationed at Fort Lewis. Taylor had a common-law wife whose name was Arlene Kline. About that time the defendant acquired a common-law wife by the name of Carmen Kalama whom he married December 7. As we have said, the defendant became a deserter March 1, 1945. A day or so later the two couples came to Portland. At that time the four were on cordial terms. After reaching Portland the two men secured employment and the two couples took up residence in the same structure in Vanport. Eventually friction developed between the two women and before long it concerned the men. There is reason for believing that the defendant took sides with his wife in the quarrels. Then the men became involved in a dispute of their own which arose out of the defendant's claim that Jerry owed him money and

that he was indifferent to the debt. The bickerings progressed to the point where the two couples found it no longer possible to live in the same structure and in the middle of December the defendant and Carmen moved to another place in Vanport. At the same time the defendant quit his employment in the foundry where he and Jerry worked.

December 22 the defendant and his wife went to an establishment where revolvers were sold and the defendant purchased one. It was a German P38 pistol. He also secured a supply of ammunition. After acquiring the gun he carried it with him wherever he went. It seems that about the same time Jerry became interested in pistols, for he told Arlene that he had found a place where he could buy one. Arlene dissuaded him from making a purchase.

December 24 the defendant was still absent from his employment. It will be recalled that he claims he drank heavily of liquor on that day. Some time after six o'clock he went to a nearby tavern which was known as Sam Turner's. There a chance friend offered him a drink of a concoction known as a "dive bomber." The defendant said that he took "a swallow" of it. Then he returned home, but shortly went again to Sam Turner's. He carried his gun with him. This time he had no more drinks but encountered in the place Jerry Taylor. He summoned him into a side room and there asked him for the payment of what Jerry owed him. Jerry replied that he had no money but that he would get some from a friend in the place and pay him. The defendant was not satisfied with that reply and proceeded to castigate Jerry. Presently Jerry, so the defendant swore, employed a profane epithet whereupon "everything flew up and I had this

P38 with me and I jerked it out and told him I wanted my money." At that point he fired twice and left. As he was making his way home he claims that "everything looked screwed up," but he nevertheless succeeded in entering his home. After he mentioned the shooting to his wife he went to the highway and before long got in beside Poole in the latter's automobile.

The foregoing narrative as to what occurred on the 24th before Poole was killed was taken from the defendant's testimony. It indicates that, notwithstanding his claim that he drank heavily in the course of the day, he recalled clearly his altercation with Jerry; in fact, he was able to repeat all of the derisive remarks which he addressed to his erstwhile friend.

The State's version of what occurred in Sam Turner's tavern is different from the above. According to the State, the defendant, upon encountering Jerry, asked for the repayment of a dollar which Jerry had recently borrowed. After the dollar had been given the defendant, he, at the point of his gun, demanded that everyone in the place put their belongings upon a table and repair into a back room. In the meantime, according to the State's version, the defendant fired his gun twice, one bullet striking Jerry in the leg and the other almost hitting Arlene.

The defendant, referring to what occurred after the Taylor episode, testified:

"I wanted to go somewhere. I didn't know where I was going, but I was going somewhere.

"Q. Why were you going away?

"A. At the time I told her I knew I had done some shooting.

"Q. Didn't you want to get away because you knew at the time the police would be looking for you?

"A. Well, I believe I did."

It will be recalled that there were several wounds from blows upon Poole's head, but the cause of his death was the gunshot wound. The defendant swore that he could not recall directing Poole to drive to the spot where death occurred. We now quote from his testimony:

"Q. As I understand your statement here, to this jury, that if you hit Poole on the head, you have no memory of it?

"A. That is right.

"Q. And if you shot him, you have no memory of it?

"A. That is right.

"Q. I will ask you further if it isn't a fact that you did hit him on the head with a gun?

"A. What is that?

"Q. I will ask you if you did not hit him on the head with the butt of the gun?

"A. I could have, I don't know.

"Q. I will ask you whether or not the last time you saw him he was in a bent over position?

"A. He could have been. I don't remember."

The brief which his counsel filed with this court says:

"It should be remembered by the Court that this is not a case in which the defendant is claiming an alibi or has stood mute and refused to testify, nor does he claim that there were other persons present. He simply says, 'I don't know.' Defendant has never denied that he was the person who shot Poole. His position simply is that he does not remember anything beyond the point where he was in Poole's car with him."

With the foregoing as a background, we shall now consider the second assignment of error which challenges rulings which received in evidence purported

confessions made by the defendant. Some of the purported confessions were made in Philadelphia to two officers of the Federal Bureau of Investigation whose names are Earl R. Wilson and Finis Y. Sims. They were made while the defendant was in the custody of the military authorities and are partly in writing and partly oral. The written part assumes the form of four statements in the handwriting of the officers; each is signed by the defendant. Two of the statements were written and signed January 7, another January 8 and the last January 9. January 10 the defendant prepared four sketches or maps depicting the streets and other places in Vanport which he mentioned in his written statements. The oral part of the confessions consists of the defendant's talk in the course of the five interviews which he had with the two officers. January 15, while he was on the train returning to Portland in the custody of Jack Wills, a deputy sheriff of Multnomah County, the defendant gave Wills an oral account of the Taylor episode and of the manner in which he hit Poole over the head with his gun and then shot him. The remaining confession was made to the district attorney of Multnomah County in the district attorney's office after the defendant was brought from Philadelphia and had expressed a wish to speak to that official.

We shall first consider the admissibility of the statements which the defendant made to Wilson and Sims of the F. B. I. Those two officers were assigned to the investigation of violations of the National Automobile Theft Act. When the defendant reached his mother's home he was told by her that the F. B. I. had inquired of her for his whereabouts. The defendant surrendered himself to the military authorities the

next day, but Wilson and Sims did not talk to him until a week later, January 7.

Mr. Sims did not attend the trial, but Mr. Wilson, he being the one who was in charge of the inquiry which brought forth the statements, testified. He swore that when he and Sims interviewed the defendant the first time they were primarily interested in the theft of Poole's car and had little information concerning the manner in which Poole was killed. They knew nothing about the bruises upon his head or anything concerning the fact that the defendant possessed Poole's ring and watch. Neither had ever been in Portland or Vanport and both were unfamiliar with the streets in those places. Wilson testified that when the defendant made statements to the two officers concerning the manner in which he entered Poole's car and later hit Poole over the head, they communicated with the Portland F. B. I. office and secured from it additional facts which they submitted to the defendant. In that way he accounted for the fact that more than one interview was had. The following is a copy of the statement which the defendant signed on January 9. The handwriting is that of Mr. Wilson but the signature is that of the defendant:

"Philadelphia, Pa., January 9, 1946.

"I, Wardell H. Henderson, make the following voluntary statement to Finis Y. Sims and Earl R. Wilson, whom I know to be Special Agents of the Federal Bureau of Investigation. No threats or promises have been made to me in order to induce me to make this statement, and I have been advised that this may be used against me in any court of law.

"I, Wardell H. Henderson, also known as Aaron T. Robinson, born Nov. 26, 1919, at Winston-Salem,

North Carolina. The name Aaron T. Robinson that I use is the name of my step-father who resides in Phila., Pa. with my mother, Marie Heath Robinson, at 1948 N. Cammac St. I have resided in and about Van Port City, Oregon, from about March, 1945, up until the night of Dec. 24, 1945. My wife Carman Kalama, whom I married on Dec. 7, 1945, using the name Aaron T. Robinson and myself resided in an apartment unit 2207, at 5857 Broadacres, Van Port City, Oregon.

"On the evening of Dec. 24, 1945, I left my home about 8:30 p. m., carrying a P. 38 Blue Steel German made Automatic pistol with the magazine containing four (4) thirty-eight (38) Caliber copper nosed cartridges. This gun I had previously purchased from the Security Loan Office on December 22, 1945, for the sum of $42.00. The reason I am able to recall the name of loan office is because I have been showan a receipt marked paid in full for Pistol, dated 12-22-45 which was placed on back of loan office business card. This receipt was found in my wallet which I had turned over to my mother.

"The gun, I placed in the outside pocket of a black leather jacket I was wearing. I walked out to the Highway knowen as the Vancouver Highway and turned up the Highway towards Vancouver, Washington. I had gone about a quarter mile or more when I observed what I thought was a tap room or beer joint. There was a number of cars parked around this place, some of which were occupied. I left the Highway and walked up towards these parked cars. My reasons for going there was to obtain an automobile in order that I could leave Town. As I approached these cars I observed a man about 30 years of age, no hat, about 160 lbs. wearing a light brown overcoat get into a car on the left hand side. I went to the right hand side of this man's car and opened the door and seated myself beside the driver. I immediately pulled the automatic pistol which I was carrying from the pocket of my jacket. I told this man to 'keep driv-

ing' at the same time keeping the gun on him. This man drove to the Highway when I next instructed him to turn 'left'. As we were going down the Highway towards Van Port City I asked this man 'what he had on him.' He replied he had 'nothing on him.' I felt his pockets as he was driving the car. He said 'You don't believe me, do you'. I said 'no.' The driver then asked me to hold the wheel and made a search of his pockets. I then asked him to give me his wrist watch which he was wearing on his left wrist. This was a round Silver stainless Steel wrist watch with a stainless Steel wrist band. This he handed to me. He next pulled from his finger a silver ring with a round brown stone in it. I looked at the ring then opened the glove compartment and threw the ring inside. The watch I placed in my jacket pocket. We drove down the Highway untill we came to Broadacres when I told him to make a 'right turn.' We drove down this street for about five (5) blocks when I again directed him to turn right down a dirt street. We drove down this dirt road about a half block when I ordered him to stop. I next ordered him to get out of the car on the right side with me. As he stepped from the car I raised my arm and hand containing the gun and crashed it down on his head. This man staggered from the blow but did not go down. I again struck him over the head with the gun. The second blow staggered him and he started to fall. As he started to fall towards the ground, I again struck at him and the gun went off. I immediately jumped into the car and backed out on to the dirt street, driving this man's car a 1940 Chev. Sedan painted dark blue, bearing Washington license plates for the year 1945, to Broadacres St. There I turned left and went towards the Highway, where I made another left hand turn and drove the car to Tacoma, Washington.

"I have been exhibited a Stainless Steel, Water Proof Wrist Watch which I recognize as the one surrendered to me by the driver of the above

described automobile on evening of Dec. 24, 1945 while driving down Highway towards Van Port City Oregon. This watch had a stainless steel band which I removed and threw in trash can before turning it over to my mother Marie Robinson on Dec. 30, or Dec. 31, 1945 at 1948 N. Cammac St., Phila., Pa.

"I have read the above statement consisting of four (4) full pages, initialed them and all corrections and signed this the last page.

Signature<br>Wardell H. Henderson

Witness
Earl R. Wilson, Special Agt. F. B. I., Phila., Pa.
Finis Y. Sims, Special Agent F. B. I., Phila., Pa.

Three statements preceded the above; they lack some of the details which the foregoing recites, but the second describes in detail the defendant's altercation with Jerry Taylor.

■ When Mr. Wilson was asked whether the defendant freely and voluntarily made the statements, a hearing was conducted by the trial judge, in the absence of the jury, for the purpose of determining the admissibility of the statements. That procedure was proper and is approved: Wigmore on Evidence, 3d. ed., § 861, and *State v. Jordan,* 146 Or. 504, 26 P. (2d) 558, 30 P. (2d) 751. In the course of this inquiry Wilson gave his version and then the defendant gave his. At the conclusion of the inquiry the trial judge ruled in favor of the State and thereupon the proceedings were resumed in the courtroom. A transcribed stenographic copy of all of the above constitute a part of the record before us.

We observe from the record just mentioned that Wilson swore that the first interview took place in the

morning of January 7. The interviews were held in a suite of several offices. Referring to the defendant, he said:

"He was in military custody and we were there under military regulations the same as Henderson was."

The defendant was not in the custody of his interviewers and was not under arrest except for his infraction of military regulations. On each occasion there were present individuals in addition to the defendant and the two officers. One of these was a lieutenant by the name of Britten who was in charge of the place of incarceration. Another was the guard who brought the defendant from the barracks to the suite of rooms. Wilson added:

"There were also present in the barracks and moving through this room colored sergeants and corporals and so forth, attached to the military barracks."

Before the defendant made any statements, so Wilson swore, he was told that he need say nothing and that his utterances, if he made any, would be used against him in the event of his prosecution. He was also told that if he wished to have an attorney it was his lawful right to have one. Wilson swore:

"Being in the custody of Lieutenant Britten, and particularly under his supervision, and under the Provost Marshal's office, and with Lieutenant Britten there, and the military authorities then realizing he was their prisoner and was in their custody and that he has a right to counsel, was so advised, advised that he had the right to counsel."

He added that Lieutenant Britten, as well as himself and Sims, gave that information to the defendant. Mr. Wilson declared that no threats or promises were made.

Wilson testified that the defendant gave his information voluntarily; for instance, he said:

"He admitted he took the car and transported the car and told us about the shooting that occurred to Jerry Taylor, and how he and Taylor had an argument over money. No, frankly, Wardell came out very forward with the whole thing."

Wardell is the defendant's first name. It will be recalled that when Wilson and Sims first interviewed the defendant their primary interest centered in the stolen automobile. Wilson testified:

"I started to talk to him about the violation, about which we had jurisdiction, which was the National Motor Vehicle Theft Act, and as a result of questioning him about that it brought out this other business, how he came to get the car and have it in his possession."

The defendant, upon this preliminary inquiry, conceded that before the two officers asked him any questions each gave him his name and showed him "his F. B. I. identification." He said that throughout "the sergeant stayed there and the M. P. was there and the lieutenant he was there and the two F. B. I. men." The interviews took place in a group of four offices, so he said, and people passed through them occasionally. He freely admitted that Wilson told him that he need make no statements unless he wished to. His counsel, during this preliminary inquiry, asked him: "Did he say anything about them being used against you?" He replied: "I don't recall. I wouldn't say that he did or that he did not." He denied that the officers explained to him his right to counsel. If his version of the matter is correct, Sims occasionally became petulant, but at those times Wilson manifested patience and composure. For instance, accord-

ing to him, upon one occasion Wilson declared: "No, give the boy a chance. We are in no hurry." And upon another, Wilson said: "We will take a little time. Give Skippy time to think. We don't want the boy to tell anything he didn't do." Upon still another, Wilson cautioned: "We don't want to rush the boy, if he doesn't remember, I don't want him to say anything he doesn't remember." During one of the interviews Sims left the room "and that left Mr. Wilson and me in the room." At that time Wilson was endeavoring to ascertain from the defendant the make of the car which he took from Poole. The defendant told him that it was a "Ford Mercury," and having so said, asked Wilson to read to him the information which he received from Portland. The defendant swore that Wilson replied, "I am sorry, Skippy," that he could not comply with the request, and then Wilson said, "You come now and tell me the truth about it." The defendant answered, "I have to be reminded on some of those things before I can think." At that juncture Sims re-entered the room and, according to the defendant, called him a liar. Wilson, however, admonished, "Now, now, take it easy. Let him have time to think it over."

Concerning another occasion, the defendant testified:

"And he (Sims) said, 'You are just telling a lie,' and I told him, 'No, I am not telling a lie,' and he turned around and he said, 'Are you calling me a liar?' and I said 'No, I wasn't calling you a liar,' and Mr. Wilson said, 'Now, now, there is no use in that. Give him time to think and he will think.' * * * And Mr. Sims says, 'I know damn well he is lying,' and he grabbed me here with a rubber on the end of his walking cane. He had been walking around with one hand in his pocket, and he

drew that back and he said, 'I should hit you across the head for telling such a lie,' and then Mr. Wilson said, 'Now, let the boy alone, leave him alone and Skippy will come along all right.' "

In the manner indicated by the foregoing the interviews occurred, if the defendant's version is accepted. The testimony last quoted represents the nearest approach which the defendant made during the preliminary inquiry towards claiming that any violence was employed. Wilson denied that any violence whatever was employed, and likewise denied that the defendant was called a liar during any of the interviews. We observe from the record that as the examination progressed the following occurred:

"The Court: They were not abusing you physically, they were not striking you?
"A. No, they were not striking me."

The defendant testified that he was in solitary confinement in the period covered by the interviews.

■ The above is a synopsis of all the testimony offered by the parties in the course of the preliminary investigation concerning the admissibility of the statements made to Wilson and Sims. At the close of this hearing the trial judge held that the statements were freely and voluntarily made and that, therefore, they were admissible as evidence. Since the trial judge saw the witnesses and participated in their examination, his determination is entitled to the weight commonly accorded to findings entered by trial courts, and his determination should "not be disturbed on review, unless there is clear and manifest error." *State v. Layton*, 174 Or. 217, 148 P. (2d) 522, and decisions therein cited.

Although the foregoing synopsis mentions all the

evidence which the defendant presented upon the preliminary inquiry, yet after the State had rested and the defendant had taken the stand in his own defense he adverted to additional incidents which he evidently thought would render the purported confessions inadmissible. Why he did not voice them in the course of the preliminary hearing, we do not know. He swore that during one of the interviews "Mr. Wilson said, 'We don't have time to fool with you today, all you do is lie and I should kick his teeth out.' And Mr. Sims said, 'He should have them out a long time ago.' " By reverting to the testimony which the defendant gave upon the preliminary examination, it will be observed that he then attributed to Wilson nothing but enduring patience. Shortly the defendant mentioned a structure which he termed "the stockade" and swore that he was kept in a part of it "known as the hole." He described the stockade as a place "where they put soldiers for AWOL" and, referring to "the hole," said, "Some people call it solitary confinement." "The hole," according to him, was a small room which contained no furniture. At night he slept upon its floor, but, according to his own admissions, he slept upon the floor when he visited his mother for a day and a night immediately prior to his surrender to the military authorities. He also claimed that the officers had some papers which they examined from time to time and upon occasion told him, "The man that you took the car from, he identifies you, and he knows you." He did not state whether or not he was deceived by that statement. He testified that after he had been called a liar he told his interviewers:

"Look, there isn't anything I tell you that you will believe me. You can put down anything you want and I will sign it. * * * There is no sense

in me telling you anything. Anything you put down I will sign.''

He claimed that he made those statements repeatedly and that as a result the officers put into the writings statements which he had not uttered. The defendant urges that the statements represent, not what he told the officers, but their version of how Poole met his death.

"They were taking the information," the defendant continued, "all that I put in there, and if it didn't sound right, what I was telling them, I would state it and they would finish it and put it in, and if I told them something and it didn't sound right they would not put it in there. * * * They said, 'You must have killed the man,' and I told them I didn't know what happened. I would not say I hit him or I did not. I don't know actually what happened.

"Q. And about this statement, 'As I struck him the third time the gun went off.'?

"A. They put it that way. I said, 'I don't say that I did and I don't say I did not. You put it down and I will sign it because I don't know what I did.

"Q. And then: 'I immediately got back into this man's car which was a 1940 Chevrolet sedan, painted dark blue, bearing Washington license, and drove to Tacoma, Washington. I had no idea what happened to this man after he had fallen.' What about that?

"A. I said I could have driven the car from there where they said it was toward Tacoma, but I didn't drive it all the way into Tacoma.''

Those quotations were made from the defendant's direct examination by his own counsel. The quoted part within the questions are statements taken from the confessions. Going on, the defendant testified that during one of the interviews he complained about being

kept in solitary confinement and that after telling the officers he was willing to sign anything, asked them, "What are the chances of getting out of solitary confinement?" He swore that the F. B. I. agents replied: "I don't know. This is the Army. We can't get you out of there. You have to wait in there." He said that after that reply had been made, "I spoke to the lieutenant and he said, 'We can't let you out. The F. B. I. have got you.' "

After the defendant had rested his defense, Mr. Wilson denied that the defendant was called a liar in any of the interviews and swore that he wrote into the confessions nothing except the defendant's utterances. He conceded that he did not write into the confession anything about the defendant being intoxicated Christmas Eve, but swore that the defendant made no such claim.

According to Wilson, he reduced to writing at the close of three of the interviews the information given by the defendant and Sims wrote the substance of the other. Concerning at least one of the writings, he swore that the defendant was seated to his right and that he was watching what was being written. Occasionally the defendant, so Wilson said, would stop him and request a correction. Several corrections appear upon the four statements; adjacent to each are the defendant's initials. He concedes that he placed them there. Wilson swore that after the writings were prepared they were handed to the defendant and that he read them. Each is signed by the defendant. He concedes his signature. Referring to the defendant, Wilson said:

"He read the statements and called our attention to several mistakes that had been made and they were crossed out and other words added and they were initialed."

In the left-hand margin of each page the defendant wrote his initials. He denies, however, that he read the papers; his words are:

"No, I looked it over but I did not read it over."

Concerning his signature and his initials upon the pages, he stated:

"They would say, 'You write this, you write this, you sign here.'"

In explaining at least one of the corrections, the defendant said that he detected the need for it when Wilson "read it to me." It is apparent from that answer that the defendant was, to that extent at least, familiar with the contents of the papers and that Wilson wanted to write faithfully the defendant's assertions. Each statement is written in large, clear script. Even a glance at the pages would be bound to pick up some of the contents.

The above, we believe, fairly states the facts concerning the defendant's questioning by Wilson and Sims. There remains only the matter of drawing a conclusion as to whether or not (1) the defendant freely and voluntarily spoke, and (2) the officers correctly reduced his statements to writing.

██ Today, to a greater extent than ever before, the courts insist that a confession, to be admissible, must be shown by the State to have been in fact freely and voluntarily made. If compulsion was employed, the confession is inadmissible. The ultimate purpose of the exclusionary rules applicable to confessions is to reject confessions made under circumstances that withheld from them evidentiary trustworthiness. Although the fundamental requirement is that a confession must have been freely and voluntarily made, the fact that

it was not a spontaneous utterance but was induced by questioning does not deny it admissibility: *State v. Layton*, supra. Much of the information men daily receive comes as a result of questioning, and its trustworthiness is not lessened by that fact. It is evident that the rule's requirement that the prisoner's declaration must have been freely and voluntarily made is applied in a practical way.

■ An extra-judicial confession is admissible in this State even though the officer to whom it was made did not inform the accused of his right to consult counsel, of his right to remain silent and of the fact that his declarations would be used against him: *State v. Layton*, supra; *State v. Moore*, 124 Or. 61, 262 P. 859; and *State v. Wilder*, 98 Or. 130, 193 P. 444. See also *State v. Butchek*, 121 Or. 141, 235 P. 367, 254 P. 805; and, generally, see 22 C. J. S., Criminal Law, § 822, p. 1441, and 20 Am. Jur., Evidence, § 505, p. 435.

It will be observed that all of the interviews occurred in a suite of rooms through which people constantly passed. The two officers never had the defendant alone in a secluded place where the absence of others, in the event of a threat, could be deemed a harbinger of danger; in fact, he was not even in their custody; he was a prisoner of the military authorities. A lieutenant of the Army and at least one noncommissioned officer were always present, and with their demeanor the defendant took no exception. If the defendant felt in any of his five meetings with Wilson and Sims that he was in danger of any harm, he did not mention that fact from the witness stand.

■ The fact that the confessions were made while the defendant was in a custodial institution does not

deprive them of free and voluntary character: *State v. Layton,* supra; *State v. Humphrey,* 63 Or. 540, 128 P. 824; *State v. Blodgett,* 50 Or. 329, 92 P. 820; and Wigmore on Evidence, 3d ed., § 851. In the present instance, the defendant, at the time of the purported confessions, was not a prisoner of any civil officer. He had surrendered himself into the custody of those who had him in charge. The fact alone that the defendant was held in close confinement did not render his confession incompetent; see *State v. Layton,* supra; annotation 50 L. R. A. (N. S.) 1077, 18 L. R. A. (N. S.) 798; and *State v. Lewis,* 112 La. 872, 36 So. 788. It is true that the so-called "hole" lacked a bed, but the defendant, as a witness, did not testify that his sleep was impeded by that fact; in fact, he said nothing about sleep. He seemed more concerned with the fact that he was kept in solitary confinement than he was with the lack of a bed. We know of no rule requiring a jailer to provide company for his prisoners. The defendant does not contend that he was not given adequate, proper and wholesome food. From the fact that he did not even mention the subject, we assume that his room was supplied with adequate heat, light and ventilation.

■ Even if Sims and Wilson called the defendant a liar, which we do not believe, yet no reason has been called to our attention for believing that the statements which he made to them were not freely and voluntarily uttered. When the defendant was brought into the room where Wilson and Sims were seated he knew that he was not obliged to speak. No compulsion of any kind was used to elicit a word from him. No promises and no threats were employed as means to induce him to say anything true or false. The interviews were not unduly long and he suffered from no mental weari-

ness. He makes no contention that in order to forestall the officers from calling him a liar he confessed to crimes which he had not committed. His sole contention is that the officers refused to believe some of his statements and called him a liar. There is no rule that the use of abusive language alone is sufficient to show that a confession lacks voluntary character and is without evidentiary trustworthiness: *Bushby v. People,* 73 Colo. 472, 216 P. 519. The defendant makes no contention that the appellation ''liar'' touched a sensitive spot in his nature or upset him. He merely claims that the word was used. It may be that he himself at times employs that term. The latter, if it was used, should not have been employed, but if it was, we have been unable to discover anything in the circumstances which shows that its purported use rendered the defendant's statement involuntary.

Without further analysis, we express the belief that the trial court's finding that the defendant spoke freely and voluntarily to Wilson and Sims is well supported by the record. We have carefully reviewed the additional evidence concerning the voluntary character of his utterances which the defendant submitted after the preliminary inquiry had been concluded, but find nothing which indicates that his declarations were not made freely and voluntarily. In fact, we believe that the two officers went to unusual, but commendable, lengths to safeguard the defendant's rights. The load of the criminal deeds which a wrongdoer has committed is a heavy one and not infrequently he wants to talk to someone. In the present instance, the defendant hurried across the continent to his mother and sought her counsel. The next day he adopted her advice and surrendered himself to the military authorities. The trial judge, in ruling upon the admissibility of his

purported confessions, had a right to believe that the weight of his load, not compulsion, caused him to speak.

We shall now express our belief as to whether the statements constitute what the defendant told Wilson and Sims or whether they represent, as the defendant claims, the officers' deductions as to how Poole met his death.

The defendant is not illiterate. To the contrary, he advanced in the public schools into some of the high school grades. He nowhere claims that anyone denied him an opportunity to read any of the papers which he signed. Not only did he sign and initial each of them, but, in addition, he drew with his own hand four sketches which illustrated and identified the places mentioned in his statements. Although he claimed from the witness stand that he could not recall details, yet these four plats show that he is apparently possessed of a retentive memory. He makes no claim whatever that any improper inducement was employed to prompt him to draw the sketches.

A finding that the statements represent faithfully what the defendant told Wilson and Sims would be well supported by the evidence. The defendant concedes that he deceived the officers into writing into one of the statements:

"While we were driving on the highway somewhere between Boys Town, Nebraska, and the next town I throwed the P38 pistol away. I throwed it out on the right hand side of the highway after we noticed a highway patrol car following us."

As a witness, he admitted the falsity of that answer and swore that he sold the gun in Chicago while passing through that city on his way to Philadelphia. His acknowledgment of the falsity of the information which

he gave to Wilson and Sims about the gun shows the extent to which they were dependent upon him for an account of the facts. Seemingly they were dependent upon him not only for information about the gun, but also for all of the other facts stated in the confessions such as the date of his marriage, the maiden name of his wife, the street number of his residence, the kind of gun, the course taken by the Poole car after the defendant entered it, the manner in which he administered blows upon Poole's head, and the fact that he possessed Poole's jewelry after the robbery. The defendant manifestly gave them the information which they wrote into the statements. If Wilson and Sims concocted the explanations of the crime which are set forth in the confessions, they surely would not have written that the gun was discharged inadvertently. Nor would they have written into the second statement of January 7, "I do not know whether either one of these shots struck him" (Jerry Taylor), when, as a matter of fact, one of the bullets hit Jerry and caused blood to run down his leg.

■ We are satisfied that the officers wrote faithfully upon the papers the defendant's declarations. In our opinion, the defendant spoke freely and voluntarily to Wilson and Sims. No error was committed when evidence of the defendant's confessions to those two officers was received.

We come now to the defendant's contention that error was committed when the trial judge held admissible the confession which the defendant made January 15 to Jack Wills, a deputy sheriff of Multnomah County, who returned him to Portland. The defendant and Wills were upon the train at that time. Before the trial judge made the attacked ruling he conducted

a preliminary hearing outside the presence of the jury. Wills was the only witness who testified in the course of this hearing. He swore, in part:

"I told him if he felt he wanted to talk to me he could talk to me. I said, 'Anything you may say will be used against you.' I said, 'You are entitled to counsel,' and he said, 'I don't have any money for counsel,' and I said, 'It is the Court's duty to appoint counsel for you' and he said, 'I feel like talking about it,' and I said, 'Go ahead and I will listen to you,' and he went ahead with his story."

Although the defendant was Wills' prisoner, he was not handcuffed or shackled in any way. The two men were in a drawing room of the train.

Although the defendant did not testify during this preliminary hearing, later, when he took the witness stand, he swore that as the train was approaching Portland Wills said: "Do you feel like saying anything about the case? If you don't want to, you don't need to." The defendant testified that he replied: "I will give you as much information as I can." He made no denial that Wills advised him of his right to counsel.

After the trial judge had ruled that Wills' testimony was admissible, the proceedings were resumed in the presence of the jury. Wills then related what he said the defendant told him. We shall omit mention of the narrative concerning the shooting of Jerry Taylor and the manner in which, after the defendant got into Poole's car, he ordered that it be driven to the spot where Poole's life was taken. According to Wills' testimony, the defendant told him:

"As the man got out of the car he said he stepped over and he said as he did, 'I struck him over the head twice with the butt of the gun', and he said the man staggered as if was going down and then he said, 'It is hazy to me', but he said 'I must have

turned the gun around because I shot the man and I heard the shot,' and I asked him if he saw him fall and he said, 'Yes, he was down when I got into his car.' I asked him why he left in such a hurry and he said he wanted to get out of there because he knew the shot would attract attention and there would be somebody there right away. I asked him if the headlights of the car were shining on the body as he left and he said, 'No, I was careful because I didn't want to see the man as he was laying there.' "

According to Wills, the defendant described to him how he stole a license plate off another car and put it on Poole's after taking possession of the latter. Further, according to Wills' testimony, the defendant explained to him about an empty shell case which was found near his apartment December 25 and accounted for it by saying he "was doing a little target practicing." Wills also testified that the defendant told him that he pawned his gun in Chicago, and drew a sketch of the area where the pawnshop was located which he handed to Wills. Upon cross-examination he testified:

"Q. One thing he was hazy about, is exactly what happened at that point?

"A. He was very certain about the shot.

"Q. That a shot was fired?

"A. Yes, and that he had the gun in his hand.

"Q. But he was quite hazy about who got out of the car first or how he happened to strike him?

"A. No, he was not hazy about who got out of the car first. He said, 'I got out first on the right side and I ordered him out also on the right side.'

"Q. Did he say anything about the left door not being able to open?

"A. No, he didn't say anything about the left-hand door.

"Q. What was it he was hazy about?

"A. He was hazy about the position the man was in when the shot was fired. I remember he did

not know. He said he was struggling or he didn't know how far down he was or whether he was standing up.

"Q. That is the part he said he was hazy on?

"A. Yes, but he remembered the shot."

As a witness, the defendant did not deny that he made the statements to Wills which the latter attributed to him, but claimed that he merely repeated to Wills "what the F. B. I. men said." For instance, he was asked, and answered, as follows:

"Q. Did you ever tell Mr. Wills you struck the man three times over the head?

"A. No, I said according to what the F. B. I. men said, the man was struck back here (indicating) from what statements he had, and what he told me. I said 'I must have hit the man over the head. I don't know. · They said I did.'"

It is apparent, however, that he made statements to Wills which he had not made to Wilson and Sims; for instance, concerning the sale of his gun, the shooting of Poole and his care not to have the automobile lights shine upon the fallen body of his victim.

■ We are satisfied that he spoke freely and voluntarily to Wills. No error was committed when the trial judge ruled that Wills' testimony was admissible.

The sixth, being the last of the confessions, was made according to the State, by the defendant to the late Thomas B. Handley, when the latter was district attorney for Multnomah County. According to Mr. Wills, the defendant told him that upon reaching Portland he wished to speak to the district attorney and asked Wills to secure an appointment for him. For instance, Mr. Wills testified:

"He said he wanted to talk to the district at-

torney and I said he could when he came back. He said, 'I would like to plead guilty to second degree murder,' and I said, 'That is up to the District Attorney, and I have nothing to do with that at all.' I said, 'You have to be represented by counsel, and you have to go before a jury. You could not plead guilty to it.'"

The meeting was arranged and the defendant was afforded an opportunity by Mr. Handley to say anything that he wished. A stenographic report was made of the questions and answers. The statements made to Mr. Handley were substantially the same as those to Wills, Sims and Wilson. At the close of the interview the defendant said to Mr. Handley:

"If I had another chance to prove to the world I was different than what they think I was, because I have always did people favors and not tried to do anything against them. This particular time I don't know what was wrong with me."

In accounting for his statements to Mr. Handley, the defendant, as a witness, explained that after he had asked Wills to arrange the interview Wills "said 'Why do you want to see him?' and I said, 'I would like to see him' and then he said 'Why?' and I said, 'I would like to tell him the truth about these statements that were made.'" Going on, he swore that he told Wills that he wanted to tell the district attorney, not what Wilson and Sims reasoned must have taken place, but what he recalled. He testified that thereupon Wills told him, "I think it is best to tell it as near as you can what you told to the F. B. I." and at that point he decided, so he swore, to repeat to the district attorney the statements which he had made to Wilson and Sims.

■ The instructions to the jury told that body in

clear language that for a confession to be evidence it must have been made freely and voluntarily. They added:

"There is no presumption of law that a confession is voluntary. * * * If you do not find that the alleged or purported confessions were voluntary, they should not be considered by you, * * *."

The defendant was entitled to no better instruction than that: Wigmore on Evidence, 3d ed., § 861.

We are satisfied that the rulings concerning the purported confessions are free from error and that the assignment of error based upon those rulings is without merit.

We shall now consider the seventh assignment of error which is predicated upon contentions that error was committed when the trial court received as evidence three photographs showing Poole's wounds and also received the blood-stained coat and shirt which Poole wore at the time of his death. The three photographs purport to show, respectively, a wound upon Poole's head made by a blunt instrument, a wound made in his back by a bullet which entered there, and a wound in his chest made by a bullet which left his body at that place. The shirt and coat contained bullet holes which, according to the State, correspond with those in the body. There is no contention that the photographs inaccurately portray the wounds. The defendant contends that the photographs and the clothing are gruesome and not material to any issue in the case.

It will be recalled that the defendant told Wilson and Sims that after he struck Poole upon the head with the butt of a pistol the latter inadvertently was discharged. The State denied that the defendant shot Poole accidentally. It presented testimony showing

that the defendant's pistol could not be fired by hitting it. It claimed that the defendant shot Poole while he was lying upon the ground with his back turned toward the defendant. It claimed that he fell to the ground from the blows upon his head which the defendant had administered. The State also presented evidence showing that if the deceased had been shot by a gun which was used as a bludgeon, powder marks would have been deposited upon the deceased's clothing and also possibly upon his body. According to evidence presented by the State, a careful examination, aided by appropriate instruments, failed to find any powder marks whatever upon Poole's clothing or body. The shirt and jacket were offered by the State to prove that they were free from powder marks. The photograph showing a wound upon Poole's head was offered as evidence of the severity of the wound. The photograph of Poole's back and the one of his chest were offered to support the State's contention that the wound in the back was a wound of entry and the one in the chest a wound of exit. The bullet holes in Poole's clothing, according to testimony presented by the State, likewise show that the shot which took Poole's life entered his body from the back, left through his chest and then pierced his right arm while the latter was doubled under him. The State claims that the bullet holes in Poole's body, arm and clothing show that his right arm was so far forward toward his chin that it was impossible for him to have got it there through his own strength. It claims that the weight of his falling body forced it there. Based upon these circumstances, the State contends that Poole could not have been standing but must have been lying inert upon the ground when he was shot.

The defendant's contentions that the three photographs and the clothing were not material is based

upon an argument that other evidence given by Dr. V. D. Sneeden, a witness for the State, served the State's purpose equally well and that, therefore, these five objects were cumulative. The coat and shirt were real evidence: Wigmore on Evidence, 3d ed., § 1150. They have a tendency to prove (1) the absence of powder marks; (2) the place where the bullet entered and left Poole's body; and (3) the position of his right arm at the time when he was killed. Manifestly, the two objects were material to the issues.

■ Photography has achieved such a high degree of excellence that in some instances it surpasses the spoken word as a means of portraying facts. Normally, photographs, when verified by required preliminary proof, are admissible in evidence: *State v. Casey,* 108 Or. 386, 213 P. 771, 217 P. 632. In the present instance, the photographs, according to our belief, show more clearly than the testimony of Dr. Sneeden that the wound in the back is the place where the bullet entered and the one in the chest the place where the bullet left. The conclusion appears to be inescapable that the photographs were material and essential to the State.

The photographs, showing, as they do, wounds upon a dead man's body, are not pleasant to view. Bloodstained clothing, no one likes to touch. Yet there is nothing about these five objects which is peculiarly abhorrent or gruesome. The trial of a murder case is something which everyone prefers to avoid. The jurors in a case such as this realize the solemnity and the disagreeable nature of the duty which they are called upon to perform. Photographs which have appeared in the daily press during the war period showing the victims of atrocious misdeeds have steeled virtually everyone to gruesome sights.

In *State v. Nelson,* 162 Or. 430, 92 P. (2d) 182, this court said:

"Although a photograph might be prejudicial because of its so-called gruesome character, it is nevertheless admissible in evidence if material to some issue in the case: State v. Weston, 155 Or. 556, 64 P. (2d) 536, 108 A. L. R. 1402; State v. Weitzel, 157 Or. 334, 69 P. (2d) 958; 2 Wigmore on Evidence, § 1157; Commonwealth v. Retkovitz, 222 Mass. 245, 110 N. E. 293; State v. Gaines, 144 Wash. 446, 258 P. 508. A photograph of a dead body is properly admitted when it is material for the sole purpose of explaining and demonstrating the testimony of expert medical witnesses: State v. Weston, supra; State v. Clark, 99 Or. 629, 196 P. 360; Commonwealth v. Winter, 289 Pa. 284, 137 A. 261; Carnine v. Tibbetts, 158 Or. 21, 79 P. (2d) 974. The photograph described in State's Exhibit O is not gruesome or prejudicial: State v. Weston, supra; State v. Clark, supra. State v. Miller, 43 Or. 325, 74 P. 658, cited by defendant, has been distinguished and is not in harmony with State v. Weston, supra. See also State v. Finch, 54 Or. 482, 103 P. 505, and State v. Clark, supra, where the case of State v. Miller, supra, is distinguished."

■ We believe that the five items attacked by this assignment of error were material, and we also believe that the mere fact that they were unpleasant to the sight and to the touch did not deny them admissibility. This assignment of error is free from merit.

The sixth assignment of error attacks rulings which (1) permitted one Stanley MacDonald, a witness for the state, to testify regarding powder dispersion tests which he made, and (2) received as evidence a bullet, a complete cartridge and an empty cartridge case. The defendant argues that before MacDonald's testimony was received proof was not submitted showing that the conditions under which he conducted his experi-

ments were similar to those existing at the time the deceased was shot. He contends that the three pieces of ammunition were irrelevant.

By reverting to the statement which the defendant signed January 9 and which is copied in a preceding paragraph, it will be observed that he stated that Poole was shot with a P38 German-made automatic pistol which he (the defendant) held in his hand and that he (the defendant) used 38-caliber copper-nosed cartridges in his pistol. The pieces of ammunition above mentioned, according to the evidence, were of the type found at Sam Turner's place after the defendant had shot Jerry Taylor there, and were also the type found outside the defendant's apartment after he had done practice shooting there. They were of the same kind used in the tests and were the only kind of ammunition the gun would fire.

MacDonald, a ballistics expert, described tests which he made with a gun of exactly the same type which the defendant's confession showed he possessed when he shot Poole. The tests were made at distances of three, twelve, sixteen, twenty and twenty-four inches from a target for the purpose of determining the distance at which the firing of the gun would deposit powder marks upon an object at which it was fired. MacDonald swore that his tests showed that up to and including twenty-four inches the firing of the gun left powder marks. He was the individual who examined Poole's clothing and found no powder marks upon it. Based upon his experiments, MacDonald expressed a belief that the gun which killed Poole must have been fired at a greater distance than two feet. We now quote from *Erickson's Dairy Products Co. v. Northwest Baker Ice Machine Co.*, 165 Or. 553, 109 P. (2d) 53:

"Evidence of an experiment is admissible if it

is of such nature as to aid the jury in determining the issues of fact. Obviously, some experiments would tend towards confusion rather than enlightenment: 20 Am. Jur., Evidence, § 257. It is for the trial court in the exercise of its discretion to determine such preliminary question, and this court will not interfere unless there is an abuse thereof. No hard and fast rule can be announced as to the degree of similarity of conditions under which the experiment is to be made. It is plain, however, that the law does not require that the conditions be identical. It is sufficient if there is a substantial similarity of conditions. When the conditions are so dissimilar from those of the occurrence in question as to tend towards confusion, the evidence of an experiment should be rejected: Kohlhagen v. Cardwell, 93 Or. 610, 184 P. 261, 8 A. L. R. 11. Also see numerous authorities in note 85 A. L. R. 482. We see no abuse of discretion in the instant case. The dissimilarity in conditions affected the probative value of the evidence but was not of such character as to render the evidence inadmissible. After all, we must assume that the jury was composed of men and women of ordinary sense and intelligence who would take into consideration the dissimilarity of which plaintiff complains.''

■ We believe that the exidence which preceded the reception of MacDonald's testimony showed that he conducted his experiments with a gun and ammunition similar to that employed in the taking of Poole's life. This assignment of error is without merit.

■ The fifth assignment of error attacks rulings which permitted the State to show that the defendant shot Jerry Taylor shortly before he allegedly took the life of Poole. This assignment of error urges that the shooting of Jerry Taylor was ''a separate and distinct crime from that charged in the indictment.'' It is, of course, well established that proof is not admissible

showing that an accused committed other crimes when offered merely for the purpose of blackening his character. But, as said by Wigmore on Evidence, 3d ed., § 216, if such evidence is not admissible when it is relevant

"By every spot of blood with which he taints the steps of his criminal progress, he succeeds in increasing the safety of his new crimes. This is an ample reason, if no other were even conceivable, for refusing to make an exception, already antagonistic to principle and obnoxious to practical procedure. 'No man,' in the neat phrase of Mr. Justice Brewer, 'can by multiplying crimes diminish the volume of testimony against him.' * * * That general principle (ante, § 10) is that all facts affording any reasonable inference as to the act charged are relevant and admissible, including facts showing * * * motive, * * *."

From Underhill's Criminal Evidence, 4th ed., § 184, we quote:

"Under this exception to the general rule, where facts and circumstances amount to proof of another crime than that which is charged, and it appears probable that the crime charged grew out of the other crime, or was in some way caused by it, the facts and circumstances of the other crime may be proved to show the motive of the accused. * * * And, generally, if one crime may have been perpetrated for the purpose of aiding in the commission or concealment of another, or to aid the escape of the accused, the incidental crime may be shown as furnishing a motive for the commission of the crime for which the accused has been indicted."

In *State v. Burke,* 126 Or. 651, 269 P. 869, 270 P. 756, it is stated:

"In many instances, evidence of another offense is relevant to prove motive."

By reverting to the statement which the defendant

signed January 9, 1946, and which is quoted in a preceding paragraph, it will be observed that he said:

"I left the Highway and walked up toward these parked cars." My reason for going there was to obtain an automobile in order that I could leave town."

When Wilson was asked whether the defendant amplified that statement, he replied:

"He told us that he had gotten into some trouble with a Taylor boy, a colored boy, at what was known as Sam's place in Vanport City * * *."

A few minutes before the defendant approached Poole "to obtain an automobile" he had committed felonies, at the point of a gun in a public place occupied by many people, and surely inferred that the police would be summoned. Very likely he reasoned that when the police were told of his misdeeds they would learn of his status as a deserter. Thus, he had an impelling motive to flee, or, as he put it, in language quoted in a preceding paragraph, "I wanted to go somewhere. I didn't know where I was going, but I was going somewhere." In order to get "somewhere" he needed an automobile. The need for the latter, the jury had a right to infer, caused the defendant to take Poole's life.

■ In our opinion, the attacked testimony was material. It proved motive. This assignment of error lacks merit.

■ We shall now consider the first assignment of error which the defendant expresses thusly:

"The Court erred in failing to direct a verdict of not guilty in that instant case."

In support of that contention, appellant's brief argues:

"If the confession were improperly admitted,

as is contended later (see Assignment of Error No. 3, infra), it would seem clear that the evidence in this case is insufficient to sustain a verdict of guilty. Without the confessions, the most that the State proved was * * *."

Section 26-937, O. C. L. A., provides:

" * * * ; nor is a confession only sufficient to warrant his conviction, without some other proof that the crime has been committed."

That section of our laws is satisfied when the state presents independent evidence of the corpus delicti: *State v. Elwell*, 105 Or. 282, 209 P. 616; *State v. Howard*, 102 Or. 431, 203 P. 311; and *State v. Weston*, 102 Or. 102, 201 P. 1083. The corpus delicti in the present instance consists of two elements: (1) Proof that Poole was dead, and (2) proof that death resulted, not from accident, but from a criminal agency other than suicide: *State v. Howard*, supra; *State v. Weston*, supra; and Wigmore on Evidence, 3d ed., § 2072.

The defendant's brief says: "That the deceased was killed by a bullet seems well established." In preceding paragraphs we showed that Poole was killed by a bullet which entered his body from the back, pierced the aorta, left his body through the front of the chest and then went through the upper part of his right arm. The absence of powder marks upon the diseased's clothing shows that the muzzle of the gun which fired the bullet was more than twenty-four inches from Poole when the trigger was pulled. It is clear that Poole could not have fired the gun. In addition to the bullet wounds, the deceased's head displayed several severe bruises and his left ear was virtually torn from the head. A part of his scalp was loosened by the blows. One of his shoulders showed the effect of having been struck with a bludgeon of some kind. Obviously, the

wounds and bruises were not the result of an accident. It is reasonable to conclude from the circumstances that the blows upon Poole's head caused him to fall to the ground unconscious in such a way that his back was turned toward his assailant. A photograph which was taken before the body was moved shows the deceased lying upon his face and right arm. The latter is pinned under the right shoulder in such a peculiar manner that the back presented a ready target for one intent upon evil. It is reasonable to infer that while Poole was lying in that position the fatal shot was fired. Concurrently with the death, Poole's auto was taken. A few minutes previously he had parted with his jewelry at the point of a gun.

██ We believe that the record shows to the required degree that Poole's death was caused by neither accident nor suicide but by a felonious act. Thus, both the corpus and the delecti were established by independent evidence. It was not necessary under the requirements of § 26-937, O. C. L. A., to identify the defendant with the criminal agency: Wigmore on Evidence, 3d ed., § 2072. This assignment of error lacks merit.

The second assignment of error complains because the trial judge refused to remove "from the jury's consideration the question of first degree murder." The defendant argues: "This was not an indictment for a so-called 'felony murder.' * * * It is, therefore, incumbent upon the State to prove premeditation and deliberation as required by Section 23-401 and Section 23-414, O. C. L. A.".

██ If the gun was discharged accidentally, as claimed in the four statements which bear the defendant's signature, but which he repudiates, the elements of deliberation and premeditation which are essential to

first-degree murder, are absent. But those statements, although they were introduced by the State, were not conclusive upon it: 22 C. J. S., Criminal Laws, § 842, p. 1477, and Underhill's Criminal Evidence, 4th ed., § 284. The State could lawfully rely upon parts of the statements which it deemed truthful and present evidence at variance with other parts. The following evidence, which the jury had a right to accept as portraying the facts, indicates that Poole was not shot when he was upon his feet by an accidental discharge of a weapon, but by a deliberate firing of a gun held in the hand of the defendant and aimed at Poole while he was lying upon the ground with his back turned toward the defendant: (1) If a gun, while being used as a bludgeon to strike Poole over the head, was accidentally discharged, the bullet, in all likelihood, would have passed over his head or in the direction of his assailant. (2) The variances in the accounts given in the several confessions as to the manner in which the gun went off discredits the claim of an accidental discharge; the following is illustrative of the variances: (a) "As I struck him the third time the gun went off." (b) "As he started to fall towards the ground I again struck at him and the gun went off." And (c) "I shot the man." (3) The defendant's gun could not be fired by striking or hitting it. (4) The absence of powder marks upon Poole's clothing and the fact that the defendant's gun left powder marks upon an object when fired within twenty-four inches of it shows that its muzzle was more than twenty-four inches from Poole when his life was taken. (5) The fact that when Poole was shot, his right arm (as indicated by the bullet holes in his arm, body and clothing) was in a position where he could not have moved it through his own strength shows that he was not standing but had fallen

to the ground upon his arm. (6) The defendant confessed to Wills, "I shot the man." (7) Immediately before the defendant's gun killed Poole he was engaged in delivering heavy blows upon Poole's head and was thereby manifesting a felonious attitude toward his victim.

■ Malice need not be proved by direct evidence. It may be inferred from circumstances.

■ We find this assignment of error lacking in merit.

The fourth assignment of error complains because the trial judge refused to include in his instructions to the jury the following part of § 23-406, O. C. L. A.:

> "If any person shall, in the commission of an unlawful act, * * * involuntarily kill another, such person shall be deemed guilty of manslaughter."

The instructions told the jury:

> "The crime of manslaughter for the purpose of this cause is committed where any person without malice, express or implied, and without deliberation but upon a sudden heat of passion caused by provocation apparently sufficient to make the passion irresistible, voluntarily kills another."

That instruction employed the words of § 23-405, O. C. L. A.

■ In *State v. Boag*, 154 Or. 354, 59 P. (2d) 396, this court said:

> "Involuntary manslaughter is the killing of another occurring without malice and unintentionally, in doing some unlawful act not amounting to felony nor naturally tending to cause death or great bodily harm, or in neglecting doing some act lawful in itself or through negligent omission to perform some legal duty."

It will be observed from that statement that in order for the homicide to rise to a level no higher than manslaughter, the unlawful act which the wrongdoer was committing when he brought death to his victim must not amount to a felony. All authorities agree with that proposition: Wharton's Criminal Law, 12th ed., § 427; Warren on Homicide, Permanent Ed., § 86; 40 C. J. S., Homicide, § 55, p. 917; and 26 Am. Jur., Homicide, § 18, p. 166.

According to the record, the defendant, unbeknown to Poole, entered the latter's automobile concurrently with Poole's entry. Then, at the point of his gun, he took from his victim two articles of jewelry and commanded the operation of the car until a dark place alongside the roadway had been reached. At that place Poole, obedient to the defendant's lethal order, stopped the car and followed the defendant in leaving it through its right-hand door. After Poole's life had been taken the defendant took his car. That evidence indicates that, apart from the homicide, the crime which was being committed was assault and robbery while being armed with a dangerous weapon—a felony: § 23-428, O. C. L. A.

Both parties quote from the parts of *State v. Magers*, 35 Or. 520, 57 P. 197, which state the required scope of instruction in homicide cases. The part which we deem material to this cause follows:

"The statute, Hill's Ann. Laws, § 200, in prescribing the method of giving instructions, reads as follows:

" 'In charging the jury, the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges

of all questions of fact.' Notwithstanding which, the rule is well settled that on a trial of a person for the crime of murder, if there is no evidence tending to reduce the homicide to manslaughter, it is not incumbent upon the court to charge with reference to the lesser crime; but if there is any evidence, direct or indirect, however slight it may be, that tends in any manner to show that the killing was done in the heat of passion, or under such circumstances as to eliminate the element of malice, prejudicial error is committed if the court fail or refuse to instruct the jury upon the law applicable to manslaughter.''

■ We do not believe that error was committed when the requested instruction was refused. In language to which the defendant takes no exception, the trial judge defined the various elements of homicide, and added:

''Whenever, as in this case, the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, you, the jury, may take into consideration the fact the defendant was intoxicated at the time, if you so find, in determining the purpose, motive, or intent with which he committed the act.''

This assignment of error is without merit.

The eighth assignment of error charges that error was committed ''in modifying defendant's requested instruction No. 19 regarding the use of an 'alias' and in adding thereto the material hereinafter quoted.'' The ''material hereinafter quoted'' follows:

''If you believe that he adopted an alias or another name for the purpose of concealment or for the purpose of making flight more successful, if you believe that he was guilty of flight, then, in that event, you could consider the question of an

alias with reference to his actions, but only in the event you believe from the evidence beyond a reasonable doubt that the use of an alias was for the purpose of concealment and causing his identity to be lost or assisting him in flight and for that reason you have a right to consider the use of an alias."

Parts of the instruction to which the defendant takes no exception told the jury that in the indictment:

" * * * the name of the defendant appears as Wardell H. Henderson, alias Aaron Robinson. * * * I instruct you that the fact that there was an alias has no evidentiary bearing upon the guilt or innocence of the defendant in this case. It does not in any way indicate that the defendant has a previous criminal record. Any person has a legal right to be known and to use more than one name, and the fact that the defendant was here charged under an alias, merely means that at the time the indictment was returned, the prosecution was not positive which name was his correct one. * * * but again I repeat, the fact that he has used two names does not in and of itself indicate in any way his guilt or innocence."

Then came the part, previously quoted, which the defendant attacks. It will be observed that the instructions told the jury in unmistakeable language "the fact that he used two names does not in and of itself indicate in any way his guilt or innocence."

■ "It is today universally conceded," so says Wigmore on Evidence, 3d ed., § 276, "that the fact of an accused's flight * * * assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself."

Our decisions are in harmony with that statement: *State v. La Plant,* 149 Or. 615, 42 P. (2d) 158, (use of false name) ; *State v. Osborne,* 54 Or. 289, 103 P. 62;

*State v. Ryan,* 47 Or. 338, 82 P. 703, 1 L. R. A. (N. S.) 862; and *State v. Lee,* 17 Or. 488, 21 P. 455. The evidence indicating that the defendant, immediately following the homicide, engaged in a flight which took him from Portland to Tacoma, back to Portland and then on to Philadelphia is unequivocal and was not explained by him. While the defendant was passing through Portland his stolen car became disabled and he visited two repair places before the needed repairs were made. At each place he appeared to be nervous and fingered his gun. In order to hasten the making of the repairs, the defendant, besides paying the garage proprietor his regular charge, gave the mechanic who performed the work a bonus of twenty dollars. The defendant directs attention to the fact that he began to use the name of Aaron Robinson when he deserted the Army nine months prior to Poole's death, and argues that "he was fleeing, if he was fleeing at all, in order to avoid being picked up by the military authorities." It very likely is true that after he shot Jerry Taylor he feared apprehension by the military authorities, but since he did not begin his flight until nine months after his desertion, the jury had the right to infer that he was running away from charges that would arise out of his beating and shooting of Poole. He told Wilson, according to the latter's testimony, that he surrendered himself to the military authorities because "he just thought he could lose himself in the shuffle of being transferred from post to post and possibly overseas." That remark, together with the very fact that he surrendered himself to the military authorities, indicates that his flight was from the anticipated criminal charges and not from fear of being apprehended as a deserter.

We do not believe that the word "adopted" in the challenged instruction should have been used; the

evidence does not show that the alias was adopted for the purpose of the purported flight. A subsequent sentence correctly employed the word "used". We think that the challenged instruction contains no substantial error.

We come now to the ninth, being the last, assignment of error:

"The Court committed prejudicial error in selecting the alternate juror, Ruby Seel, to serve in place of the regular juror, Mildred Wood."

The record shows that after the arguments of counsel had begun and before the instructions to the jury were given, the following occurred:

"The Court: Let the record show that juror, Florence W. Turner, became ill during the trial of the case this morning and is unable to attend, and the alternate juror, Ruby Seel, will replace Mrs. Turner. Is that satisfactory to the State and to the defense?

"Mr. Collier: It is, your Honor.

"Mr. Evans: Yes, your Honor, it is.

"The Court: The juror will take her seat in the jury box. You may proceed, gentlemen."

Section 26-916, O. C. L. A., says:

"If, before the final submission of the case, any juror die, or be unable to perform his duty because of illness or other cause which the court, in its discretion, shall deem sufficient, he shall be dismissed from the case. The court shall cause to be drawn the name of an alternate juror, who shall then become a member of such jury as though he had been selected as one of the original jurors."

From the brief submitted by the defendant's counsel, we quote:

"The juror actually selected by the Court was the first alternate juror. However, no drawing of

any kind was held at that time. At this point we wish to make it clear that there is no suggestion that the trial court did not act in good faith, or, if this is an error or irregularity that could be waived by defendant's counsel that it was not waived. The question, as we see it, however, is whether or not the defendant had the trial by jury that is granted him by our Constitution.''

The defendant's brief also says:

" * * *. nor is any suggestion made that in the original selection of the alternate jurors, Section 26-914, O. C. L. A., was not followed. The defendant does contend, however, that Section 26-916, quoted above, was not followed by reason of the fact that the Court did not 'cause to be drawn' the name of an alternate juror, but instead selected the first alternate juror to serve as the regular juror.''

In *State v. Harvey,* 117 Or. 466, 242 P. 440, this court held:

"A defendant accused and tried for the commission of a felony has the absolute right to a trial by jury, which means a body of twelve competent jurors. However, this court has held that a defendant in a criminal case, although charged with the commission of a felony, may waive his constitutional rights, and that his failure to exercise such rights is deemed a waiver. See State v. McDonald, 8 Or. 113, a case of larceny; State v. Powers, 10 Or. 145 (45 Am. Rep. 138), a case of homicide, wherein the defendant was convicted of murder in the first degree.''

After that opinion was announced, the United States Supreme Court adopted the same point of view and held that a defendant can waive his right to be tried by a jury of twelve: *Patton v. United States,* 281 U. S. 276, 74 L. Ed. 854, 50 Sup. Ct. 253, 70 A. L. R. 263. In that case a jury of twelve was duly impaneled,

but seven days after the trial began one of the jurors, because of illness, became unable to serve further. Thereupon the government, and counsel for the defendant, the latter personally assenting thereto, stipulated that the trial should proceed with the remaining jurors. The trial concluded the following day in a verdict of guilty rendered by the eleven jurors. The decision, written by Mr. Justice Sutherland, which did not represent the unanimous view of the court, declared that constitutional provisions pertaining to jury trial do not establish trial by jury as a part of the framework of government, but operate only as a guarantee to everyone accused of crime of his right to such a trial. The decision held that an accused may waive the right altogether or consent to a trial by less than twelve jurors. Other recent decisions to like effect are *Taylor v. United States,* 142 Fed. 808, certiorari denied 323 U. S. 723, 89 L. Ed. 581, 65 S. Ct. 56, rehearing denied 323 U. S. 813, 89 L. Ed. 647, 65 S. Ct. 113; *Coates v. Lawrence,* 131 Fed. 2d 110, affirming 46 Fed. Sup. 414, certiorari denied 318 U. S. 759, 87 L. Ed. 1132, 63 S. Ct. 532; *Easler v. State,* 25 Ohio App. 273, 157 N. Ed. 813; *People v. Pierce,* 369 Ill. 845, 15 N. E. 2d 845; *State v. Zabrocki,* 194 Minn. 346, 260 N. W. 507; *State v. Tiedeman,* 49 S. D. 356, 207 N. W. 153; *Kirk v. State,* 247 Ala. 43, 22 So. 2d 431.

■ We are satisfied that the irregularity which occurred when the trial judge substituted one of the alternate jurors for the one who became ill was an error which the defendant could, and did, waive.

This assignment of error, in our opinion, possesses no merit.

The above disposes of all contentions advanced by the defendant. We have not mentioned every authority

cited in his brief and in that of amicus curiae, but all received careful attention. We are satisfied that the defendant was fairly tried and that the evidence showing his guilt was of the kind that the jury had a right to accept as truthful.

The judgment of the circuit court is affirmed.

---

### PETITION FOR RE-HEARING

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY, HAY and WINSLOW, Justices.

ROSSMAN, C. J.

The appellant's petition for a rehearing and the brief which accompanies it advances two propositions as bases for the grant of a rehearing. The first, as expressed by the appellant, says:

"Assignment of Error No. IX, relating to failure of the Court to draw the alternate juror."

The second is:

"Appellant respectfully requests reconsideration by this Court of its decision herein, for the reason that, in overruling the appellant's second assignment of error, the Court stated as facts, in the opinion, matters which are not supported by the record."

Upon reading, in its printed form, our opinion, we observe that the part which disposes of the ninth assignment of error is capable of creating the impression that the trial judge's method of selecting an alternate juror, when occasion for the use of one arose, violated constitutional provisions which assure trial by jury. We did not intend to create that impression. We cited *State v. Harvey*, 117 Or. 466, 242 P. 440, and *Patton v. United States*, 281 U. S. 276, 50

S. Ct. 253, 74 L. Ed. 854, 70 A. L. R. 263, for the purpose of showing that even if the error upon which the appellant relied amounted to a violation of a constitutional safeguard, the defendant could have waived it.

Article I, § 11, Constitution of Oregon, says:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *; provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial . by jury and consent to be tried by the judge of the court alone, such election to be in writing; * * *."

Our previous opinion did not mention this constitutional clause because we did not believe that the manner of choosing between the alternate jurors when occasion for the use of one of them occurred was governed by our Constitution. Section 26-916, O. C. L. A., says that when a juncture occurs which affords occasion to impanel one of the alternates as a member of the jury, "the court shall cause to be drawn the name of an alternate juror, who shall then become a member of such jury * * *."

The manner in which an alternate becomes a member of the jury is not governed, according to our belief, by any part of our Constitution, but is one of the details of jury trial which is left to the discretion of the legislature. *State v. Chase,* 106 Or. 263, 211 P. 923, says:

"The common-sense view of the whole matter is that the intention of the framers of the Constitution was to insure to a defendant the right guaranteed by Magna Charta, namely, a trial by an impartial jury of his peers, leaving details as to

competency and method of selection to the legislature.''

Mr. Justice BAILEY expressed the same thought in *State v. Savan,* 148 Or. 423, 36 P. (2d) 594, by saying:

"The defendant is not entitled to have a particular juror hear his case.''

There is no contention that the method of selecting the jury, including the alternates, denied to the defendant a fair and impartial body of his peers. We are satisfied that the irregularity of which the defendant complains was not governed by any constitutional provision. It was of the kind that could be waived. And it was waived.

The appellant's complaint that our decision states "matters which are not supported by the record" is illustrated by the following which we quote directly from the brief which accompanies the petition for a rehearing:

"The court stated that the following evidence warranted the jury in inferring that Poole was deliberately shot by a gun held in the hand of the defendant and aimed at Poole while he was lying on the ground with his back turned toward the defendant. The court then lists certain statements. The third is '(3) The defendant's gun could not be fired by striking or hitting it.' We do not believe there is any evidence in the record to support this statement. The evidence was that a gun similar to the type had by the defendant on the evening in question, if in good repair, could not be discharged accidentally by a blow or shot.

"'(4) * * * and the fact that the defendant's gun left powder marks upon an object when fired within 24″ of it shows that its muzzle was more than 24″ from Poole when his life was taken.' Again there is no evidence as to what 'the defendant's

gun left.' The only evidence on the point showed what marks a gun of similar make to that owned by the defendant left when fired in an experiment.''

Our previous opinion indicates that the gun which the State claims the defendant employed in taking the life of his victim never came into the possession of the State. For the sake of clarity, we add that in one of the defendant's confessions he stated that he threw the gun from his car while fleeing across the State of Nebraska when he thought an officer was pursuing him. In another of the confessions he claimed that he disposed of the gun to a pawnbroker in Chicago. It was not found after his arrest. By reverting to the confession quoted in our preceding opinion, it will be seen that it contains a precise description of his gun and of the ammunition with which it was loaded the evening of December 24, 1945. Our opinion said:

"We believe that the evidence which preceded the reception of MacDonald's testimony showed that he conducted his experiments with a gun and ammunition similar to that employed in the taking of Poole's life.''

It is our belief that the evidence warranted the jury in finding, if in fact it so found, that the gun with which MacDonald conducted his experiments was of exactly the same kind and make that the defendant described in his confessions. In making our statements in our previous opinion we were not dealing with the weight or cogency of the evidence, but with its admissibility.

The petition for a rehearing is denied.