Argued July 9, affirmed July 31, rehearing denied October 9, 1928.

STATE v. J. V. BURKE ET AL.

(269 Pac. 869; 270 Pac. 756.)

For appellant there was a brief over the name of *Messrs. Sheppard, Phillips & Ralston* and *Mr. Oscar Furuset*, with an oral argument by *Mr. Chester A. Sheppard*.

For respondent there was a brief over the names of *Mr. Stanley Myers*, District Attorney, *Mr. George Mowry, Mr. Leon W. Behrman* and *Mr. John Mowry*, Deputy District Attorneys, with oral arguments by *Mr. Behrman* and *Mr. George Mowry*.

BROWN, J.—Section 187, Chapter 207, General Laws of Oregon, 1925, codified as Or. L., Supp., page 1403, reads:

"Every owner, officer, director, or employee of any bank or trust company who embezzles, abstracts, or willfully misapplies any of the money, funds, credits, assets or property of such bank or trust cdmpany, whether owned by such bank or trust company or held for safe keeping, or as agent, or held in trust, or who, without authority of the board of directors of such bank or trust company, issues or puts forth any certificate of deposit, draws any order, draft or bill of exchange, makes acceptance, assigns any note, bond, draft, bill, bill of exchange, mortgage, judgment or decree, or who makes any false entry in the books or statements of the bank or trust company, with the intent in either case to injure or defraud such bank or trust company, or deceive any officer of such bank or trust company, or any person who with like intent aids or abets any owner, officer, director or employee of any bank or trust company, in violation of this section, shall be deemed guilty of a felony, and, upon conviction thereof, shall

be punished by a fine of not more than $5,000 or by imprisonment in the state penitentiary not less than one year nor more than twenty years, or by both such fine and imprisonment, in the discretion of the court.''

On May 14, 1909, the Bank of Kenton was incorporated as a state bank, with a capital stock of $50,000 divided into 500 shares of the par value of $100 each. The original incorporators were H. W. Mahan, J. W. Sifton and Geo. F. Heusner. Its principal place of business was at Kenton, a suburb of the City of Portland. At the time of its organization, or shortly thereafter, J. V. Burke, defendant herein, was elected vice-president, and, at the time of the alleged offense charged in the indictment, held the office of president. Burke was likewise a stockholder, director and vice-president of the United Meat Company, the corporation referred to in the indictment. The certificate of the State Bank Examiner authorizing the bank to engage in business was issued on October 8, 1909. It closed its doors as a going concern on December 3, 1926, about twenty days after the payment of the alleged fraudulent check out of its funds. A few days later the United Meat Company, a corporation, the drawer of the check, went into the hands of a receiver, where it yet remained at the closing of the record made in this cause.

So far as material to this case, the by-laws adopted by the Bank of Kenton on its organization provide:

''It shall be the duty of the president to preside at all meetings of the stockholders and directors * * .

''The president shall have general charge and supervision of all the officers and employees of the corporation, and in all cases where the duties of the subordinate officers and agents of the corporation are not specifically prescribed by the by-laws or by reso-

lutions of the stockholders, or where their duties are not prescribed by the board of directors, they shall obey the orders and instructions of the president.

"He shall exercise such general direction and supervision over the affairs of the company as its interests may require, and shall perform all acts required by law of the president of a banking corporation."

State's Exhibit 6 for Identification reads:

"Stockholders' Meeting.
"Bank of Kenton.

"The annual meeting of the stockholders of the Bank of Kenton was held at the bank building on January 11, 1923, at 4:00 P. M. Mr. Heusner presiding.

"The following stockholders were present, representing the number of shares set opposite their respective names:

| | |
|---|---|
| J. H. Thatcher, | 10 shares. |
| R. R. Thatcher, | 5 shares. |
| George F. Heusner, | 20 shares. |
| W. Keeler, | 30 shares. |
| S. W. Herrman, | 10 shares. |
| R. E. Menefee, | 24 shares. |
| J. V. Burke, | 220 shares. |
| J. G. Edwards, by L. Enderud, proxy, | 5 shares |
| Baldwin Sheep & Land Co., by L. Enderud, proxy, | 45 shares. * * |

"Approved:

| | |
|---|---|
| J. V. BURKE, | A. M. THOMPSON, |
| "President. | "Secretary." |

██ The defendant asserts that the indictment is defective, first, for failure to aver the loss to the bank by reason of the alleged misapplication of its funds; second, for failure to allege that the misapplication of such funds was committed without authority of the board of directors; and, third, for failure to allege that the United Meat Company was insolvent.

These objections are without merit. We have set out the indictment in full in our statement. The crime charged is a statutory offense that is fully defined by statute; and, as a general rule, in alleging the criminal act charged, it is sufficient to follow the words of the statute defining the offense. That rule is applicable to the case at bar: *State* v. *Scott,* 63 Or. 444 (128 Pac. 441); *State* v. *Kubli,* 118 Or. 5 (244 Pac. 512); *State* v. *Owen,* 119 Or. 15 (244 Pac. 516).

■ To be sufficient, an indictment must contain every element of the offense intended to be charged; it must apprise the accused of what he has to meet; and it must so define and identify the offense that he may, whether convicted or acquitted, be able to defend himself, in case he be again indicted for the same offense, by pleading the former record.

■ That the indictment in the case at bar informs the defendant of the crime with which he is charged, with such particularity as will enable him to prepare for his defense, there is no doubt. It identifies and defines the alleged offense so that, whether convicted or acquitted, he may, if indicted again for the same offense, defend himself by pleading the record of his former trial. Furthermore, it enables the court to see, without going out of the record, that a crime has been committed, and it explains the nature of that crime: Or. L., § 1448; Joyce on Indictments, § 9; *Cochran and Sayre* v. *United States,* 157 U. S. 286 (39 L. Ed. 704, 15 Sup. Ct. Rep. 628).

■ This case was tried upon the theory that there was a confederation between the officers of the Bank of Kenton and the United Meat Company wilfully to misapply the funds of the bank to the use and benefit of the meat company, with intent feloniously to injure

and defraud the bank. Our statute provides that all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or aid and abet in its commission though not present, must be indicted, tried and punished as principals: Or. L., §§ 1458, 2370. To sustain the charge contained in this indictment, it is essential that there be both a wilful misapplication of the funds of the bank and an intent to injure and defraud the bank. Briefly stated, then, the question that the jury was required to determine is as follows:

Did the defendant wilfully misapply the money, funds and credits of the Bank of Kenton by cashing the check described in the indictment, with the felonious intent to injure and defraud that bank?

Among the pertinent facts shown by the record, we note the following:

The paid-up capital of the bank was $50,000, and its surplus amounted to about $10,000. Under the law of this state limiting the amount of loan to any individual, firm, company or corporation to 20 per cent of its aggregate paid-up and unimpaired capital and surplus, $12,000 was the maximum amount that the bank could lend to the meat company. The United Meat Company had borrowed that amount on its promissory note, and, in addition, had drawn many overdrafts on the bank long prior to the date of the cashing of the check forming the nucleus of this litigation. During this time Burke was an officer of the bank, and, likewise, a stockholder, director and vice-president of the United Meat Company. The record further shows that President Burke, who had "general charge of all the officers and employees of" the bank, and whose guiding hand was exercising "such general direction and supervision over the affairs of

the company as its interests may require," was, during this same period, personally liable on a promissory note for $16,900 in favor of Mrs. Didania Day, which note he had individually signed with A. A. Hallander, president of the United Meat Company. On this note only $500 was ever paid.

It should likewise be borne in mind in considering the evidence in this cause that Burke was not a mere figurehead in the workings of the banking institution. He was an experienced banker. He was the loan agent of the bank, and, under its by-laws, the bank's chief executive. He spent much of his time at the bank, and drew $200 a month for his services as president. He was by far the bank's largest stockholder, and necessarily wielded a great influence in the conduct of the affairs of the bank.

■ As a general rule, the cashier of a bank is the executive officer thereof, through whom the financial operations are conducted. But, in this connection, the following observation from 1 Banks and Banking, Michie, page 706, is pertinent:

"Under the custom and usage of modern banking, the president has been so generally clothed with power and authority beyond that ordinarily inherent in his office, as outlined above, that such custom and usage has been judicially recognized, and in some jurisdictions he is no longer looked upon as a sort of figurehead having only the powers of a director, but as the chief executive officer of the bank, having great influence upon the policy of the bank and the conduct of the various employees in the discharge of their duties * * ."

The state has marshaled an array of facts to show that the president of the bank must have had knowledge of, and participated in, the payment of the fraudulent overdrafts drawn by the United Meat Company

upon the Bank of Kenton. Was there sufficient evidence to take the case to the jury? This is the toilsome problem before us.

In the case of *State* v. *Zullig,* 97 Or. 427 (190 Pac. 580), the question of circumstantial evidence was involved; and Mr. Justice BENNETT, a trial lawyer of wide experience, said:

"A case of circumstantial evidence is peculiarly one for the jury."

There is no direct evidence that Burke ever paid, or caused to be paid, a dollar on the check described in the indictment. There is no direct evidence that he ever saw the check, or that he knew that such a check had been drawn upon the bank. There is an abundance of evidence, however, that Thatcher, the cashier of the bank, saw the check, honored it, and caused payment thereof out of the funds of the bank. Moreover, there is evidence that he withheld the check from the records of the bank for several weeks. This fact is significant. In order to reach the verdict rendered, the jury must have determined from the evidence that there was a community of unlawful purpose and action between the president and the cashier of the bank in the matter of cashing the fraudulent check. That evidence, though strong and convincing, is, in its application to President Burke, indirect or circumstantial in character.

■ This takes us back to defendant's motion for a directed verdict. A motion for a directed verdict admits as true the plaintiff's evidence, and likewise every legitimate inference which may be drawn therefrom: *State* v. *Williams,* 102 Or. 305 (202 Pac. 428); *State* v. *Elwell,* 105 Or. 282 (209 Pac. 616).

In addition to the indebtedness of $12,000 evidenced by a promissory note given by the United Meat Com-

pany to the Bank of Kenton at some time prior to the alleged cashing of the check mentioned in the indictment, the state established that, at the time the check was cashed, the meat company owed the bank about $150,000 arising from overdrafts of that company that had been issued and paid by the bank. The state adduced evidence tending to show that Burke had knowledge of this enormous indebtedness. Besides, a circumstance tending to show that Burke not only had knowledge of this indebtedness, but that he was likewise active in carrying on the affairs of the bank, lies in the fact that the indorsements of payments of interest on the $12,000 note were all in Burke's handwriting. His knowledge of the overdrafts is shown by an audit made by Haskins and Sells, and by a letter from A. A. Hallander in which there appears an express reference to a "$63,750 indebtedness." So, also, the record discloses a series of memorandum checks signed by Burke, president of the Bank of Kenton, on behalf of the United Meat Company, and in the handwriting of Burke we find the notation, "Interest on draft." An additional circumstance of some moment is found in the fact that Thatcher owned but a small interest, and Burke a large interest, in the bank, and that Thatcher was under the direction of Burke, who was present each day at the bank, and who was there when the fraudulent check for $3,669.10 was received by Thatcher. Furthermore, Burke not only had access to, but was familiar with, the books and records of the bank, and, as we have already stated, was the loan officer for that institution.

Another circumstance pressed upon our attention as tending to show knowledge and intention upon the part of Burke is a transaction with the United Meat

Company with relation to a check for $2,878.21. On June 1, 1926, the Benson Commission Company sold the United Meat Company 49 head of cattle for $2,878.21. On June 7th following, the meat company, for the purpose of obtaining possession of the cattle, drew a check on the Bank of Kenton in favor of the Benson Commission Company for the amount of the purchase price of the cattle, and at the same time prepared an original deposit slip in that amount, together with a duplicate thereof, thus indicating that on that date the United Meat Company had deposited in the Bank of Kenton to the credit of the Benson Commission Company the sum of $2,878.21. The Bank of Kenton accepted this check and the two deposit slips and placed an O. K. upon the duplicate deposit slip, in effect certifying that there had been deposited by the United Meat Company in the Bank of Kenton to the credit of the Benson Commission Company the amount of $2,878.21. This duplicate deposit slip bearing its false O. K. was delivered by the Bank of Kenton to the representative of the United Meat Company, who, in turn, delivered it to the Benson Commission Company; and that company, in the belief that the amount of $2,878.21, had, in truth, been deposited to its credit in the Bank of Kenton, executed a "gate order" for the 49 head of cattle. The check, though in the possession of the bank from June 7th, was held in suspension until June 30th, when it was charged to the ostensible or visible account of the meat company. This particular transaction was handled by J. V. Burke himself, and the fraudulent O. K. was written by him. Moreover, at the time of the presentation of that check to the bank, the meat company was indebted to the bank in an amount exceeding $100,000, and had no

funds in its ostensible or visible account. The writer regards this transaction as a most important one, as lending strong support to the contention of the state and the finding of the jury that Burke at all times had knowledge of, and acquiesced and participated in, the conduct of the affairs of the bank.

A further circumstance that tends to show that President Burke had full knowledge of the insolvency of the United Meat Company and the large amount of overdraft due the bank at the time of the presentation of the check mentioned in the indictment is the fact that, more than two years prior to the crash, Burke, knowing that the meat company had overdrawn its account in a large sum of money, undertook to sell stock of that company in order that it might square its account with the bank, and that, during the campaign for the sale of the stock, Burke was advised by a salesman of the meat company's securities that the management of that company "was very bad," and that "the financial statement was poor."

From a careful analysis of the record in its entirety, the policy of defendant Burke is apparent. When the overdraft of the meat company amounted to but little more than $30,000, Burke disclaimed any responsibility therefor and stated that Thatcher, the cashier of the bank, was responsible for this condition; but, notwithstanding this knowledge, and despite his authority as president, the cashier was retained and the amount of the overdraft, after being temporarily reduced on account of the sales of stock of the meat company, continued to grow, and to mount higher and higher, until, at the time of the presentation and acceptance of the fraudulent check at issue here, it had reached the enormous sum of $150,000.

■ The inference of guilt drawn by the jury from the character of the evidence adduced by the state was justified. Section 794 of our Code defines an inference as "a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect."

■ The fundamental law of this state provides:

"The right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state unless the court can affirmatively say there is no evidence to support the verdict." Or. Const., Art. VII, § 3c.

That command is plain in statement, and definite and certain in meaning, and applies alike to criminal and civil causes: *State* v. *Friddles,* 62 Or. 209 (123 Pac. 904); *State* v. *Hardin,* 63 Or. 305 (127 Pac. 789); *State* v. *Hill,* 63 Or. 451 (128 Pac. 444); *State* v. *Russell,* 64 Or. 247 (129 Pac. 1051); *State* v. *McPherson,* 69 Or. 381 (138 Pac. 1076); *State* v. *Catholic,* 75 Or. 367 (147 Pac. 372, Ann. Cas. 1917B, 913); *State* v. *Morris,* 83 Or. 429 (163 Pac. 567); *State* v. *Ragan,* 123 Or. 521 (262 Pac. 954). The contrary holding, as set out in the case of *State* v. *Evans,* 98 Or. 214 (192 Pac. 1062, 193 Pac. 927), is not, in the opinion of this court, the better view.

The testimony relative to another and similar offense claimed by the state to have been committed by Burke, i. e., involving the cashing of the check for $2,878.21 as hereinbefore set out, was received over the defendant's objection.

■ It is a familiar rule that all evidence must be relevant, and that "evidence of other acts, to be available, must have some logical connection and reveal evidence of knowledge, design, plan, scheme or conspiracy of the crime charged." Underhill's

Criminal Evidence (3 ed.), § 154. In many instances, evidence of another offense is relevant to prove motive or identity. While it is apparent that the jury in the cause at issue found Thatcher to be only one of a number of accomplices who wilfully confederated and conspired to misapply the property of the Bank of Kenton, and thus to injure and defraud the bank, the verdict is based upon a broad range of evidence. The conspiracy to commit the crime denounced by the statute was established by the detached acts and statements of the individual conspirators; and, as held in *United States* v. *Goldberg,* 7 Biss. 175 (Fed. Cas. No. 15,223), the acts of the parties in the particular case under investigation, the nature of such acts, the declarations and statements of the parties, either verbal or written, and the character of the transaction or series of transactions, with the accompanying circumstances as the evidence may disclose them, should be investigated and considered as sources from which evidence of the existence or nonexistence of the conspiracy may be derived. As illustrative, we take the following from the pen of Mr. Justice BURNETT in *State* v. *Kubli,* 118 Or. 5 (244 Pac. 512):

"It is not by a single detached transaction alone that we must judge the situation. * * It is competent to show what manner of man, financially, the drawer of the check was. To that end the mortgages, unpaid as they were, were competent evidence."

■■■ In proof of the essential allegations of the indictment, the record book of the Bank of Kenton showing the capital and surplus of that institution was admissible. Likewise, the note of the United Meat Company to the Bank of Kenton was relevant. So, too, were the pages from the record book of the

Bank of Kenton and the daily statements of the commercial and savings departments of that bank. Neither is there any question but that the stock ledger of the bank was competent as part of the *res gestae,* in showing the particular interest of Thatcher and of Burke in the bank. The minutes of the United Meat Company, showing that Burke was a stockholder and an officer of that corporation, were relevant: *State* v. *Whiteaker,* 118 Or. 656 (247 Pac. 1077); 16 C. J. 651, § 1290. The oath of office administered to defendant Burke as director of the United Meat Company was competent. The record of that company relating to the issuance of the check for $3,669.10 referred to in the indictment was relevant and competent for the reason that that record was made by one of the alleged conspirators. The account of the United Meat Company with the Bank of Kenton kept by one David D. Briggs who, as secretary of that company, drew the fraudulent check knowing that the meat company had no funds in the bank, was likewise relevant: *State* v. *Kubli, supra; State* v. *Owen, supra; Kingsbury* v. *State,* 27 Ariz. 289 (232 Pac. 887). Under the authorities just cited, that certain check for $110.25, drawn by the United Meat Company upon this bank in favor of the Benson Commission Company, and purporting to have been deposited with the check for $3,669.10, was relevant, as were the entries in the teller's blotter pertaining to that check and to the check described in the indictment. The Bank of Kenton's ledger sheet covering the account of the Benson Commission Company, i. e., Customers' Ledger Sheet No. 105, was competent and relevant for the purpose of showing that the check involved was held in suspension from November 12th to November 26, 1926, inclusive. The prosecution

properly introduced the bank's ledger sheet No. 97, relating to the account of the United Meat Company, for the purpose of showing that the check for $110.25 was not charged to the account of the meat company until November 27, 1926, and that the check for $3,669.10 referred to in the indictment was not charged to the meat company during the period covered by that ledger sheet. Lastly, as regards the check described in the indictment and the duplicate deposit slip in that amount, it requires neither argument nor citation of authority to support the holding that these papers were properly admitted into the record.

■ Defendant also objected to some evidence of record in relation to the Union Stock Yards, the Benson Commission Company and other matters, that is remote in character. However, though this evidence was not material to a decision of the case, it is not within the bounds of fair reasoning to hold that the substantial rights of the defendant were prejudiced thereby.

A case squarely in point with the facts in the case under consideration, and valuable for its learning and perspicuity, is that of *Kingsbury* v. *State,* 27 Ariz. 289 (232 Pac. 887). That case was prosecuted under a statute similar to ours; and the Supreme Court of Arizona, in rendering the opinion therein, thus stated its views:

"Where the disputed elements of an offense are the intent, and a conspiracy to defraud, it is plain that the scope of the evidence must be wide. Intent can only be determined by the acts of the party and his knowledge of the situation when he acts. It was not only permissible, but even necessary, for the state to show, as bearing on the intent and the conspiracy, the condition of the cattle company and the bank,

the entire history of the transaction complained of, and the circumstances showing the extent of defendant's knowledge thereof."

The language above set out is clear and the reasoning sound; and we are satisfied that the holding is correct.

■ The defendant in his brief says that the court erred in failing to give certain requested instructions, the first of which was, in effect, a charge for a directed verdict of not guilty. The next was embraced in the general charge of the court. Defendant also requested the court to charge the jury that if Burke did not see the check until after it was cashed, the verdict should be not guilty. Under the law of this state, as we have heretofore indicated, it makes no difference whether Burke ever saw the check or not, if he, wilfully and knowingly, for the purpose of injuring and defrauding the bank, committed any affirmative act in aiding and abetting the chief actor in the commission of the alleged offense.

■ The defendant saved an exception to the instruction of the court wherein the jury was charged that "no bank or trust company shall loan a sum exceeding twenty per cent of its aggregate paid-up and unimpaired capital and surplus to any individual, firm, company or corporation." This instruction was pertinent and permissible: *Kingsbury* v. *State, supra.*

■ Another instruction complained of contains the following:

"There would be no protection for the stockholders and depositors of any bank if the officers in charge of its business could be allowed to parcel out its funds in such a manner to irresponsible persons and concerns."

While that statement is true, it was not a matter for comment by the court. It were better unuttered. But, in view of the statute and the Constitution of this state, we do not believe that this or any alleged error disclosed by the record in the trial of this cause should reverse the case. Section 1626, Or. L., provides:

"After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

And the people, by their Constitution, have directed:

"Until otherwise provided by law, upon appeal of any case to the Supreme Court, either party may have attached to the bill of exceptions the whole testimony, the instructions of the court to the jury, and any other matter material to the decision of the appeal. If the Supreme Court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial * * ." Or. Const., Art. VII, § 3c.

When Article VII of the Oregon Constitution was submitted to the voters of this state by the People's Power League, the purpose of Section 3c was expressed in the Campaign Pamphlet in the following language:

"To simplify procedure on appeals to the Supreme Court and remove the pretext for new trials in those cases in which substantial justice is done by the verdict and judgment, but in which the trial court may have made a technical mistake."

While we have not specifically discussed every assignment of error, each assignment has received our careful consideration.

With a full realization of the importance of this cause to the defendant and to the public, we are constrained to hold that the law and the evidence calls for an affirmance of the judgment of the trial court.

AFFIRMED. REHEARING DENIED.

---

Rehearing denied October 9, 1928.

ON PETITION FOR REHEARING.

(270 Pac. 756.)

For the petition, *Messrs. Sheppard, Phillips & Ralston, Mr. Oscar Furuset, Mr. A. D. Leedy* and *Mr. Martin L. Pipes.*

No appearance *contra.*

BROWN, J.—The defendant petitions this court for a rehearing, upon the ground that the court erred in holding that the indictment charged a crime under the statute; in denying defendant's motion for a directed verdict; in admitting testimony to the effect that the United Meat Company was insolvent; in allowing testimony to be admitted showing the insolvency of the United Meat Company more than twenty days after the check in question had been cashed; in affirming a judgment based upon an inference not deduced from facts proved; in affirming the judgment in the face of the alleged failure of the evidence to disclose the defendant's connection with the crime charged.

The defendant, a bank president, was convicted of the crime of misapplication of its funds, as defined by Or. L., Supp. 1927, page 1403, Section 187. For a copy of the indictment, together with statement of the facts in the case and the statute under which the action is prosecuted, see 126 Or. 651 (269 Pac. 869).

In sustaining the indictment in our former decision, this court followed the holding in the cases of *State v. Kubli,* 118 Or. 5 (244 Pac. 512), and *State v. Owen,* 119 Or. 15 (244 Pac. 516), both of which were based upon the violation of the statute involved herein.

 It is fundamental that, in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury, and to be fully informed of the nature and cause of the accusation. (Or. Const., Art. I, § 11.) It is the office of an indictment fully to inform the accused of the nature and cause of the accusation that he is called upon to meet. Any indictment which fails in this is defective. An indictment for a statutory offense is sufficient if the crime be charged in the words of the statute or their equivalent. This is a general rule. This rule, however, is limited in application to causes where the words of the statute directly and expressly inform the accused of the nature and cause of the accusation against him. (Or. Const., Art. I, § 11; *Evans v. United States,* 153 U. S. 584 (38 L. Ed. 830, 14 Sup. Ct. Rep. 934.) Under the terms of Section 1440, Or. L., and Article I, Section 11, of our Bill of Rights, the indictment must charge the commission of the crime with directness and certainty, and every element of which it is composed must be concisely and clearly alleged.

 The statute involved herein was adopted from the federal Code.

It is a general rule of construction of statutes that when the law-making power of one state adopts a statute from another state, the construction theretofore given to the act by the court of last resort of the state from which the statute was borrowed becomes a part of the statute. In other words, the statute is adopted, together with its interpretation: *Dale* v. *Marvin*, 76 Or. 528 (148 Pac. 1116, 1151, Ann. Cas. 1917C, 557); *School Dist. No. 45* v. *Hallock*, 86 Or. 687 (169 Pac. 130); *Studley* v. *Luse*, 89 Or. 338 (173 Pac. 1182); *State* v. *Stilwell*, 100 Or. 637 (198 Pac. 559). In *Auld* v. *Starbard*, 89 Or. 284 (173 Pac. 664), it was held that, where a law, after having been construed by the court of last resort in the state where it was originally enacted, is adopted in Oregon, the interpretation thus given, though not binding upon the courts of this state, affords persuasive argument that it should be followed here. This applies with equal force to laws enacted by the Congress of the United States and adopted by any one of the several states; and, in conformity therewith, we adopt the interpretation placed upon the statute in question by the federal court. For a valuable note on the subject of construction of adopted statutes, see Ann. Cas. 1917B, 651.

But the statute involved in no way affects the law of our state with reference to criminal pleading. As the writer understands it, the following excerpt from "Crimes by National Bank Officers and Agents," Terrell, pages 29, 30, 31, is an accurate statement of the law.

"One of the most prevalent forms of misapplying or abstracting the moneys and funds of a bank by its officers or agents is by overdrawing their accounts. If an officer or agent of a national bank, knowing that he has no money to his credit in the bank, and no right to draw money therefrom, obtains money from the bank to which he has no right by means of an overdraft, with intent to defraud, and converts the same to his own use in fraud of the bank, he commits an offense against Section 5209 Revised Statutes. * * Its intention (the statute) was to punish certain acts which it describes, when such acts are done by one holding the relation to the bank of president, director, cashier, teller, clerk or agent. Among the acts enumerated is the act of misapplying money of the association, and a conversion by an officer of money of the bank, of which he has acquired the possession or control by means of his overdraft, drawn without right, and with intent to defraud, would constitute a misapplication of the money of the association within the meaning of the statute.

"The same is true where an officer of a bank with fraudulent intent discounts paper of or permits an insolvent outsider to overdraw his account in the bank.

"If an officer of a bank knowingly and unlawfully, and with intent to injure or defraud the bank, willfully misapplies the moneys, funds, or credits of the bank, by cashing, discounting and paying for the use and benefit of another, knowing him to be insolvent, out of the moneys, funds, and credits of the bank, any notes, drafts, or bills of exchange, drawn by and upon insolvent persons, firms and companies, knowing them to be insolvent, and knowing such notes, drafts, or bills of exchange to be valueless, he would be guilty of willful misapplication of the bank's moneys, funds and credits."

To like effect see Atwell, Federal Criminal Law Procedure, p. 601.

We have seen that the indictment charges, among other things, that the defendant, feloniously and wilfully, with intent to injure and defraud the Bank of Kenton, misapplied and converted to the use, benefit, gain and advantage of United Meat Company, a corporation, $3,669.10 of the moneys of that bank, knowing that the bank was receiving no consideration therefor. 12 C. J. 525 defines the term ''consideration'' thus:

''It means something of value in the eye of the law; something in the way of price or compensation, which may be of value to the obligor, or of detriment to the obligee; a benefit to the party promising, or a loss to the person to whom the promise is made; material cause of the contract, without which it will not be effectual or binding; the price or motive of the contract. * * ''

We believe that the indictment in the case at bar fulfills every requirement of law.

The contention that the lower court erred in denying defendant's motion for a directed verdict is not sustained by the evidence. There was some competent testimony adduced upon the trial of this cause in support of every essential allegation contained in the indictment, and the court did not err in denying that motion. For a brief summation of the evidence, see our former opinion.

■ Defendant next assigns error of the court in admitting testimony to the effect that the United Meat Company was insolvent, in the absence of a charge in the indictment to that effect. It is true that the indictment does not use the word ''insolvent'' in describing the financial condition of the United Meat Company. But it does aver that that company was paid the amount of its check when it

had no funds in the bank, and that the money was paid to that company out of the funds of the Bank of Kenton without any consideration therefor. The indictment charges that the president and his co-defendant paid and delivered to the representatives of the United Meat Company more than $3,000 of the bank's funds and credit, without receiving any consideration or value therefor. Under this allegation it was competent to adduce proof, not only of the fact of paying out of the bank's funds, but likewise of the insolvency of the company receiving the funds. The testimony of the meat company's insolvency was relevant as showing that the bank's funds were wilfully, with intent to injure and defraud, paid out by its officers without any consideration, thus establishing that these officers, upon whom was imposed the duty of protecting the funds of that bank, were, in truth, making a criminal misapplication of those funds.

Nor did the court err in admitting testimony showing the insolvency of the United Meat Company twenty days after the check in question had been cashed. The matter of the insolvency of the company on the latter date would go to the weight of the testimony, not to its competency.

We cannot agree with defendant in his contention that the judgment herein is based upon an inference not deduced from facts proved. The evidence shows that the defendant was president, a director, the manager and loan agent of the Bank of Kenton. He was likewise a stockholder and an officer in the United Meat Company, and, for a long period of time, had known that that company had overdrawn its account with the bank in a large amount. According

to the bank's by-laws he, as president, had control of the other officials thereof. His great interest in the United Meat Company led him to obligate himself personally in a large sum of money for the liabilities of that company. Motive alone would be insufficient to bring home to him the commission of the offense charged. But, when motive, opportunity, acts of omission and of commission are taken together, we are forced to the conclusion that the jury were justified in determining that the president of the Bank of Kenton was one of the responsible persons in wrecking that bank by the misapplication of its funds.

█ Another brief in support of defendant's petition for rehearing appears under the names of Oscar Furuset and A. D. Leedy. Among other things, they assert therein that Section 1626, Or. L., as construed and applied in this case, is in conflict with the Fourteenth Amendment to the Constitution of the United States. That section reads:

"After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

To similar effect, see excerpts from Or. Const., Art. VII, Section 3c, quoted in *State* v. *Burke, supra.*

The section of the Code quoted above has been law in this state from the earliest time, and its meaning has been passed upon by this court again and again.

In the case of *Dippold* v. *Cathlamet Timber Co.,* 98 Or. 183 (193 Pac. 909), we wrote the following in reference to the origin and power of our courts:

"The organic and statutory laws of the commonwealth of Oregon created her courts and define their jurisdiction. In fact, no other power could establish

the courts of the state, nor could jurisdiction flow from any other source.''

The power that created the Supreme Court and conferred upon the defendant herein his right of appeal possessed the power to enact a statute prescribing the duty of the court, as expressed in Section 1626 set out above.

In our original opinion, we refused to reverse the judgment rendered by the lower court because that court committed no errors that affected the substantial rights of the defendant.

■ It is likewise asserted in the brief just referred to that Article VII, Section 3c, Oregon Constitution, as applied in the case at bar, is violative of the Fourteenth Amendment to the Constitution of the United States, for the reason that it deprives the defendant of a jury trial.

This defendant has had a trial by jury; and, aside from his objection to the indictment, his chief complaint to this court lies in the trial court's denial of his motion to direct a verdict. The amendment assailed by defendant was adopted as a move toward the simplification of court procedure. Does the following language carved·from that amendment tend to do away with, or preserve the right to, a trial by jury?

"No fact tried by a jury shall be otherwise reexamined in any court of the state, unless the court can affirmatively say there is no evidence to support the verdict." (Art. VII, § 3c, Or. Const.)

Clearly, the foregoing, as applied in this cause, does not conflict with any provision of the federal Constitution.

The petition for rehearing will be denied.

REHEARING DENIED.