Argued November 1, 1961, reversed January 17, 1962

# THE SANTIAM FISH & GAME ASSOCIATION
## *v.* STATE TAX COMMISSION

368 P. 2d 401

*Richard Rink*, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, Gerald F. Bartz, Assistant Attorney General, and Carlisle B. Roberts, Assistant Attorney General, Salem.

*Melvin Goode*, Albany, argued the cause for respondent. On the brief were Goode & Goode, Albany.

Before MCALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

WARNER, J.

This is an appeal by the Oregon State Tax Commission, hereinafter referred to as the Commission, from a decree of the circuit court of Linn county, holding petitioner Santiam Fish & Game Association, hereinafter called the Association, exempt from corporation excise taxes under ORS 317.080 for the years 1953, 1954, 1955 and 1956.

The Association had appealed to the circuit court from the Commission's order No. 1-57-35, denying its

request for abatement. In the circuit court the matter was tried as a suit in equity.

Following an order overruling the Commission's demurrer to the petition for want of sufficient facts, the Commission answered over and a stipulation was thereafter made setting forth the basic facts. At the trial the only evidence presented, in addition to the stipulation, were the bylaws of the Association and its articles of incorporation.

The basic stipulation sets forth the following facts:

"1. The Santiam Fish & Game Association is a corporation duly incorporated under ORS chapter 61 providing for the incorporation of nonprofit corporations.

"2. The Association if exempt from corporation excise tax is exempt pursuant to either of subsections (6) or (7) of ORS 317.080.

"3. The Association is operated partially for the promotion of social welfare, regarding its various conservation activities, and partially as a social club, regarding its activities engaged in for pleasure and recreation. Some persons join the club solely for its civic functions, others join the Association solely for its pleasure and recreation functions, and still others join for both functions.

"4. The actual activities of the corporation consist of holding business and social meetings of members, making recommendations to the State Game Commission concerning fishing and hunting regulations, maintenance of field secretaries to report to the members and directors of the corporation concerning fishing and game problems on the Santiam River, Willamette and Calapooia watersheds, operating and maintaining under lease from the United States Department of Agriculture a resort consisting of a number of cabins, store, boats and accommodations at Clear Lake, Linn County, Oregon, open to the public; the ownership

and development for a boat moorage and landing for its members at the mouth of Canal Creek on the Alsea River in Lincoln County, Oregon; co-operation with the State Police and game enforcement; establishment of game refuges for pheasants and upland birds by cooperation with the State Game Commission and farmers; active participation in legislative and initiative measures relating to fish, game, wildlife and fire arms.

"5. The sources of income of said corporation are membership fees from the members, sums received for cabin, boat and other services furnished to members and the public at the Clear Lake resort, sums received for entertainment at public and membership meetings.

"6. The total receipts for 1955 were as follows:

| "Clear Lake resort receipts | $ 7,855.65 | |
| Membership fees | 1,872.50 | |
| Miscellaneous returns from programs, etc., | 1,041.35 | |
| TOTAL | | $10,769.50 |

"The total expenditures for 1955 were as follows:

| "Clear Lake expense | $ 6,031.95 | |
| General expense | 2,587.09 | |
| Alsea Property | 4,500.00 | |
| TOTAL | | $13,119.99 |

"7. With the exception of the $4,500 expenditure for the Alsea property in 1955, the receipt and expenditure figures for the other years in question are substantially the same.

"8. The receipts from the Clear Lake resort arise from the rental, of cabins and boats, to members as well as the general public. The cabins are rented to the members at one-half price plus $.50, i.e., a $5 cabin would cost a member $2.50 plus

$.50 or $3. A boat which would be rented to the general public for $1.50 would be rented to a member for $1.

"9. The Association holds an annual banquet open to the public for which charges are made.

"10. The Association does not pay cash dividends to its members."

It is the Association's contention that it is either a "civic league or organization" within the purview of section (6) of ORS 317.080 or a "club" within the scope of section (7) of the same statute. It also intimates that having some attributes of both types, it should nonetheless be declared exempt.

The pertinent portions of ORS 317.080, upon which the Association lays its claims, read:

"The following corporations are exempt from the taxes imposed by this chapter:
"* * * * *

"(6) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employes, the membership of which is limited to the employes of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes, and no part of the net earnings of which inures to the benefit of any private stockholder or individual.

"(7) Clubs organized and operated exclusively for pleasure, recreation and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private stockholder or individual."

These sections will sometimes be referred to herein as section (6) and section (7).

ORS 317.080(6) was taken from the federal Internal Revenue Code of 1924, § 231(8), 43 Stat 282.

However, the concluding phrase of the Oregon statute that "no part of the net earnings of which inures to the benefit of any private stockholder or individual," is not included in the federal act. *Oregon Physicians' Service v. State Tax Com.*, 220 Or 487, 493, 349 P2d 831 (at times hereinafter called OPS).

The current section (7) of ORS 317.080, dealing with "clubs," has remained unchanged since 1929, and was drawn almost verbatim from section 11(a) of the Internal Revenue Act of 1916 (ch 463, § 11(a), 39 Stat 766).

These federal counterparts of subsections (6) and (7), ORS 317.080, now appear in § 501, Internal Revenue Code of 1954, 26 USCA, § 501(c)(4) and (7).

■ The foregoing comparison of ORS 317.080(6) and (7) with § 501(e)(4) and (7) of the federal Internal Revenue Code is particularly pertinent because this court has for many years followed the rule that when an Oregon statute has been copied from a federal law, it will adopt the interpretation given the corresponding federal act by the federal courts. *Pacific Supply Coop. v. State Tax Com.*, 224 Or 556, 560, 356 P2d 939 (1960); *State v. Burke*, 126 Or 651, 677, 269 P 869, 270 P 756, appeal dismissed 279 US 811, 73 L ed 971, 49 S Ct 262.

■■ We have but once had occasion to construe subsection (6) of ORS 317.080 and never before subsection (7). It was in *Oregon Physicians' Service v. State Tax Com.*, supra (220 Or at 494-495) that subsection (6) received our attention. There we applied the rule declared in *State v. Burke*, supra, and *Pacific Supply Coop. v. State Tax Com.*, supra, and followed the interpretation given to the like language found in the federal code, as applied in *Hanover Imp. Soc.*,

*Inc. v. Gagne,* 92 F2d 888 (1st Cir 1937). It was therein held that all the modifying language following the phrase "local association of employees" refers only to such associations and in no way modifies the exemption granted to "civic leagues or organizations." We recognize the foregoing to be a correct construction of the statute and are also in accord with the *OPS* decision, wherein it also found that such a statutory construction is largely unimportant since it is also true that "an organization operated *exclusively* for the promotion of social welfare could not have any part of its net earnings inuring to the benefit of any private stockholder or individual." (220 Or at 495)

The Association was incorporated on May 15, 1937, under the Oregon nonprofit statute, ORS ch 61. At that time it held property valued at $3,000. Membership in the organization is open to any bona fide resident of Linn, Benton and a portion of Marion counties. The facts concerning the Association can best be summarized by reviewing them under headings signifying, first, its corporate objectives and actual operations and, second, its financial set-up.

## OBJECTIVES AND OPERATIONS

Without reciting in full the corporate purposes as contained in its articles of incorporation, it is sufficient to say that they fall within two broad general groupings: (1) to contribute to the development of its members' physical and mental capacities and promote better acquaintance and closer association between such members and among sportsmen, generally; and (2) to engage in the propagation, protection, preservation and conservation of wildlife and to cooperate with

all others engaged in such activities, and to use its influence to see that fish and game laws are directed toward such ends. In connection with the foregoing purposes, the Association is authorized "to maintain, lease, own or otherwise acquire, use, enjoy and operate such resorts and accommodations for the members of the association and general public as it may deem proper, advisable or expedient." (Subparagraph (4) of Art II, Articles of Incorporation)

██ It seems appropriate to here observe that the word "club," as employed in subsection (7), supra, means "social club" (*Keystone Automobile Club v. Commissioner,* 181 F2d 402 (3d Cir 1950)) and that social clubs exempt from tax contemplated by Treasury Regulations 111, § 29.101(9)-1 are those supported by membership fees, dues and assessments. *Kanawha-Roane Lands v. United States,* 136 F Supp 631, 637 (SD W Va 1955).

Petitioner's actual activities, all of which substantially conform to the general purposes established in the articles of incorporation, were stated in paragraph 4 of the stipulation, supra.

Paragraph 3 of the stipulation, as previously quoted, summarizes the corporate objectives, as follows:

"3. The Association is operated *partially* for the promotion of social welfare, regarding its various conservation activities, and *partially* as a social club, regarding its activities engaged in for pleasure and recreation. Some persons join the club solely for its civic functions, others join the Association solely for its pleasure and recreation functions, and still others join for both functions." (Emphasis supplied.)

## FINANCES

The corporation's total receipts and expenditures for the year 1955 are presented with some detail in paragraph 6 of the stipulation. It will be noticed that except for a 1955 expenditure of $4,500 for the purchase of the Alsea River property, the receipt and expenditure figures in 1953, 1954 and 1956 (the other tax years in question here) were substantially the same. We may thus presume that the sources of *income* and the annual amounts derived from each source for each of these four years were as follows:

■ $1,872.50 received from annual membership dues of $2.50 per member (Section 3 of Association By-laws);

■ $1,041.35 received annually from entertainment and programs at public and membership meetings, including charges made to attend an annual banquet open to the public (See paragraph 4 of Stipulation re Association activities); and

■ $7,855.65 received from cabin, boat and other services furnished to members and the general public at its Clear Lake resort. A further breakdown of the Clear Lake receipts shows that cabins there are rented to members at a discount from that charged non-members of one-half such price plus 50 cents. The same discount applies to boat rentals, the charge being $1 to members and $1.50 to the general public (See paragraph 8 of Stipulation).

The foregoing receipts represent an annual income of $10,769.50.

With the exception of the $4,500 expenditure in 1955, the total annual *expenditures* for these same four years were substantially as follows:

1. $6,031.95 expended in connection with expenses incurred at the Clear Lake resort; and

2. $2,587.09 paid out for all other expenses incurred.

Thus, the total expenditures for 1955 (including the $4,500) for the Alsea property were $13,119.99 and for the other years in question approximately $8,619.99, with a net profit per annum of $2,149.51. Notwithstanding these profits, the Association pays no cash dividends to its members.[1]

It will be observed that the financial statement set up in the stipulation is wanting in three items of detail made important in the decisions which we subsequently rely upon: (1) the portion of receipts derived from nonmembers at the resort and from returns on programs, etc.; (2) the additional expense of activities participated in by nonmembers; and (3) the expenditures, if any, laid out as "social welfare" or for the other altruistic objectives declared in its articles of incorporation.

■■ In our review of the claims made by the Association for tax relief we are mindful of the well-settled rule that statutory tax exemptions are to be strictly construed in favor of the state and against the taxpayer. *Oregon Methodist Homes, Inc. v. Horn,* 226 Or 298, 360 P2d 293, 297 (1961); *Pacific Supply Coop v. State Tax Com.,* supra (224 Or at 560-561); *Oregon Physicians' Service v. State Tax Com.,* supra (220 Or at 493). As a corollary to that rule, the taxpayer has the burden of showing that it is qualified to claim the tax immunity. However, the strict construction rule

---

[1] All the figures reflecting the Association's receipts and disbursements for the year 1955 are taken literally from paragraph 6 of the stipulation and include all there shown.

does not foreclose the application of a reasonable construction in order to ascertain the legislative intent. *Pacific Supply Coop. v. State Tax Com.,* supra (224 Or at 561).

■ The Association's first contention is that it is immune from corporate excise taxes by virtue of ORS 317.080(6), exempting "civic leagues or organizations not organized for profit." In support it asserts it "was and is operated exclusively for the promotion of social welfare"; and, as stated in its brief (at page 6), "it is obvious that the entire activities of the plaintiff are devoted to welfare of the general public." As previously mentioned, the court construed this section for the first time in the case of *Oregon Physicians' Service v. State Tax Com.,* supra (220 Or 487). It was there held that in order to qualify for exemption under ORS 317.080(6), an organization must meet the following three requirements:

" '(a) It must be organized as a civic league or organization;

" '(b) It must not be organized for profit, and

" '(c) It must be operated exclusively for the promotion of social welfare.' " (220 Or at 495)

The foregoing was followed by a citation to *Consumer-Farmer Milk Coop. v. Commissioner,* 186 F2d 68 (2d Cir 1950), affm'd 13 TC 150, cert den 341 US 931, 95 L ed 1360, 71 S Ct 803, from whence the opinion quoted with approval the following language employed in denying exemption under the provisions in the federal code corresponding to subsection (6) to a cooperative which distributed patronage funds out of profits in addition to performing some civic functions:

" 'The phrase "not organized for profit" is conjunctively linked with the phrase "but operated exclusively for the promotion of social welfare." The

necessary implication is that the organization's net income must be considered "profit" within the prohibition of section 101 (8) unless the income is devoted exclusively to promotion of social welfare. It is for this reason that a consideration of the taxpayer's dominant and controlling purpose is necessary. If that purpose, as in the present case, is primarily to benefit the taxpayer's membership economically, and only incidentally to further larger public welfare, then net income must be characterized as "profit" for purposes of section 101 (8).' " (220 Or at 500-501)

After having adopted the foregoing test of "social welfare," as found in the *Consumer-Farmer Milk Coop.* case, the court, at page 506 of the *OPS* opinion, applied the standard to be used in determining whether a corporation is exempt as a "civic organization," saying :

"* * * If the 'dominant and controlling' motive of the taxpayer is 'primarily to benefit the taxpayer's membership economically, and only incidentally to further larger public welfare,' then the exemption must be denied. A rule of thumb capable of serving the purposes of ORS 317.080 (6) in cases of this kind would very likely envision that in order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition. The group benefited may be large or small, definite or indefinite in number, but in the benefaction some motive of altruism must clearly shine forth." See, also, *Oregon Methodist Homes, Inc. v. Horn,* supra (360 P2d at 300-301).

In the case at bar the dominant and controlling motive of the taxpayer, as stated in its articles of incorporation, is "to contribute to the development of the physical and mental capabilities of its members

* * *" (subparagraph 1 of Art II, Articles of Incorporation) and only incidentally to further public welfare. It is evident from the Association's financial history (see Stipulation, paragraph 6) that the foregoing statement from the *OPS* case is particularly apposite.

The United States Tax Court recently reaffirmed the view that the phrase "not organized for profit" means that an organization can be exempt even though it has income from its operations, but only so long as the income arises from operations which result exclusively in social welfare and are devoted to that same purpose. *Lake Forest, Inc.,* 36 TC No. 510 (1961). See 6 Mertens, Law of Federal Income Taxation (Oct, 1961, Supp), 4, § 34.18.

This court went one step further in the *Oregon Physicians' Service* case when, in refusing to exempt the *OPS* because its members had no motive beyond insuring themselves against the expenses of illness, it declared:

"* * * Even if the plaintiff [OPS] devoted its entire income above expenses to charity, we would be obliged to deny the exemption. For while it is now clearly established that a charity may carry on some commercial business without losing its exemption [citing authorities], we think it is equally clear that an organization of a commercial character which obviously exists only for the benefit of its members can not claim exemption from taxation even though it pays no dividends or devotes its entire profits to charity [citing authorities]. * * *" 220 Or 507 (quoted in *Oregon Methodist Homes, Inc. v. Horn,* supra)

The stipulated facts show that the total expenditures in the tax years in question were annually between four and seven times greater than the organ-

ization's membership fees. In these same years receipts exceeded expenses from the operation of the Clear Lake resort by approximately $1,823.70 annually. This accumulated surplus was evidently in the main used for the $4,500 purchase in 1955 of the property on the Alsea River for a boat moorage and landing for the use of the Association members.

As we have already shown, this purchase caused petitioner's total expenditures to exceed its total receipts in 1955. However, in the other four years in question its total receipts annually exceeded its total expenditures by $2,149.51. Simple mathematics thus demonstrate that 85 per cent of petitioner's net income in these years came exclusively from its Clear Lake resort operations and substantially all of its surplus accruing during the four years prior to 1955 was used in the acquisition of additional properties. This is the same resort at which the members receive substantial discounts in comparison with charges collected from nonmembers. The Association has failed to show what part of its income from the resort operation came from nonmembers and what part was derived from enrolled members—an important factor in evaluating the factor of "exclusive use" asserted either under sections (6) or (7).

By the stipulation the Association admits in paragraph 3 that its organization is operated "partially" as a "social club" for the pleasure and recreation of its members. Therefore, it can not be said to be operated either "exclusively" or, as we have construed that word, "primarily," for social welfare.

The foregoing facts lead us to the same conclusion as that reached by the Tax Court in *Automobile*

*Club of St. Paul,* 12 TC 1152, 1157 (1949), which we cited with approval in *OPS,* supra (220 Or at 502):

" '* * * From the facts we have found herein, it is obvious that the income earned by petitioner was not devoted exclusively to charitable, educational, or recreational purposes, but largely inured to the direct benefit of the individual members by way of services of a commercial nature rendered to them by petitioner at lower rates than they would have to pay elsewhere.' "

In *Oregon Physicians' Service,* after reviewing those cases relied upon by plaintiff in that case, which applied less severe and rigid tests, Justice ROSSMAN turned to examine those federal cases which applied more stringent tests for exemptions and which included: *Consumer-Farmer Milk Coop. v. Commissioner,* supra; *Chattanooga Automobile Club v. Commissioner,* 182 F2d 551 (6th Cir 1950); *Automobile Club of St. Paul,* supra; *Amalgamated Housing Corporation,* 37 BTA 817 (1938), affm'd per curiam, 108 F2d 1010 (2d Cir 1940); *Industrial Addition Association v. Commissioner,* 149 F2d 294 (6th Cir 1945). These cases, after analysis, were made the basis for the prevailing rule in this state.

We refer particularly to the *Chattanooga Automobile Club* and *Automobile Club of St. Paul* cases because of the relatively similar character of these to the plaintiff organization and the manner in which it operated. Both operated as clubs, charging an annual membership fee. This fee entitled members to receive certain services incidental to automobile travel. The records in the cases reveal that those clubs expended part of their income in sponsorship of highway education programs for the benefit of the public. We interpolate to say that in the instant matter the record

discloses *no disbursements to the public causes to which the Association claims to be dedicated.* See paragraph 4 of the stipulation, where the recitals show that its interest in the causes there enumerated consisted of no more than "making recommendations," "report to" and "cooperation with" various state agencies. It also evinces interest in various legislative measures relating to wildlife. Commendable as these endeavors were, the record is silent on what amounts of its funds, if any, were expended in connection therewith.

We observe that in contending that the Association is exempt under either section (6) or (7) of ORS 317.080, it places great weight on *United States v. Pickwick Electric Membership Corp.,* 158 F2d 272 (6th Cir 1946). In that case a rural electrification cooperative project distributing TVA electricity was classified as either a civic league or an organization for the promotion of social welfare. The *Pickwick* case has since been repeatedly criticized by other federal courts and text writers. *Consumer-Farmer Milk Coop. v. Commissioner,* supra, declined to follow the *Pickwick* decision (186 F2d at 72).

In *Club Gaona, Inc. v. United States,* 167 F Supp 741, 743 (SD Cal 1958), a case like in character to that of the plaintiff here, the court in declining to follow *Pickwick,* said: "that ruling does not carry conviction and it has been repudiated by courts and text writers." (167 F2d at 743) See, also, 6 Mertens, Law of Federal Income Taxation (as amended by 1961 Cum Supp pp 36 and 37), 82, § 34.18. But we need look no further than the *OPS* case where *Pickwick* was repudiated as authority. (220 Or at 499)

■ Above we indicated the three requirements necessary to bring an organization under ORS 317.080(6).

Applying these to the plaintiff Association, we find that it was not organized primarily as a civic league or organization; and although not organized for profit, its activities produced profit; and that it was neither organized nor operated exclusively for the promotion of "social welfare." (220 Or at 495)

The Association for its second and final contention argues that it is entitled to exemption under and by virtue of section (7) of ORS 317.080. In so saying it asserts in support of this proposition that it "qualifies for exemption as a club organized and operated *exclusively* for pleasure, recreation and other nonprofit purposes, with none of the net earnings inuring to the benefit of an individual." (Emphasis supplied.)

The statement is arresting as we find it difficult to comprehend how the plaintiff can qualify under section (6) and argue that it is an organization operating *"exclusively* for the promotion of social welfare" and later claim it comes within the ambit of section (7) as a club "operated *exclusively* for pleasure." (Emphasis supplied.)

■ In determining whether a corporation was "organized exclusively" for the exempt purposes, extrinsic evidence is admissible to show the real purposes for which the corporation was organized and the manner of its operation. *Oregon Methodist Homes, Inc. v. Horn,* supra (360 P2d at 297); *Hillcrest Country Club v. United States,* 152 F Supp 896, 898 (WD Mo 1957).

■ Organizations of the character contemplated under this provision of ORS 317.080 may have "net earnings." Thus, a club organized for pleasure, recreation, and other nonprofitable purposes may derive a profit from activities which are *incidental* to the primary purposes of the club, without depriving itself of

exemption, *provided,* it does not engage in those activities as a business, but only for the convenience of its members and their guests. *Coeur D'Alene Country Club v. Viley,* 64 F Supp 540, 543 (ND Idaho 1946); *Koon Kreek Klub v. Thomas,* 108 F2d 616, 618 (5th Cir 1939); *Retailers Credit Assoc. v. Commissioner,* 90 F2d 47, 50 (9th Cir 1937), 111 ALR 152.

If the profits from the use of club facilities by nonmembers are many times larger than the amount of dues and profits received from members, there is more than an *incidental* use by nonmembers and the club is taxable. *Aviation Club of Utah v. Commissioner,* 162 F2d 984, 986 (10th Cir 1947).

In the *Aviation Club of Utah* case it was held that a club which, for patriotic purposes, opened its facilities to military officers during the war, was not exempt since its dominant activity was selling entertainment to nonmembers, such not being merely *incidental* to its social purposes. We find the following language from this case to be persuasive:

"* * * where a Club of this kind, otherwise exempt under Section 101(9), engages in extra activities amounting to a substantial and continuing business for profit, the revenue from which inures to the benefit of the members, although not distributed, it loses its exempt status. [citing authorities]

"* * * * *

"The factual line between taxability and nontaxability is not clearly definable, nor always consistent. See Scofield v. Corpus Christi Golf & Country Club, 5 Cir., 127 F2d 452; Coeur D'Alene Country Club v. Viley, D.C., 64 F.Supp. 540. But it is clear that when a club, otherwise exempt, engages in a business from which it derives profits from outside sources wholly disproportionate to its nontaxable purposes, and such profits inure to the

benefit of its members in the nature of permanent improvements and facilities, it loses its exempt status under the definitive provisions of the statute. It should be noted that to be exempt from taxation, the club must not only be organized exclusively for pleasure, recreation and other nonprofitable purposes, but it must be operated exclusively for those purposes as well." (162 F2d at 986)

The cases denying exemption stress the fact that the net earnings from profit-making activities inure to the benefit of the members in the form of an increase in services and facilities offered them without a corresponding increase in dues or other fees paid for club support. See *Aviation Club of Utah v. Commissioner,* supra (162 F2d at 986); *West Side Tennis Club v. Commissioner,* 111 F2d 6, 8 (2d Cir 1940).

The *West Side Tennis Club* case, supra, is apposite. It was there held that a tennis club lost its exempt status by reason of having annually sponsored a major tennis tournament which was open to the general public. Although the Club was found to be one organized for pleasure, recreation and other nonprofitable purposes, it was nevertheless held to have not been so operated.

The court declared:

"* * * In reality the situation is much the same as though the members had gone into the business of selling tickets for athletic events in order to make money and had then used the profits to finance a club in which they were interested. In the present case a substantial and profitable business was conducted, though for a limited time each year, which had only an indirect relation to the recreational objects of the club. An important, if not a primary, reason for holding the major tournament operations was the benefit of the mem-

bers, for they would have had to pay larger dues or restrict club operations uncomfortably unless profits had been realized by the club from outsiders who were willing to purchase tickets for the great annual tennis matches." (111 F2d at 8)

Another important test which has often been relied upon by the federal courts is: when the returns from transactions with outsiders as a whole are no more than a reimbursement for their costs to the club, the club does not lose its exemption. This principle will not, however, be unduly extended to situations involving substantial and profitable outside business. See *Barstow Rodeo & Riding Club, Inc.,* 12 CCH TCM 1351, 1353 (1953); *Coeur D'Alene Country Club v. Viley,* supra (64 F Supp at 543); *Jockey Club v. Helvering,* 76 F2d 597, 598 (2d Cir 1935).

In *Jockey Club v. Helvering,* supra, a club was held to be nonexempt as a club. There, the court, after having referred to the fact that none of the club's net earnings could inure to the benefit of any member, interpreted the provision of the federal statute corresponding to section (7) in that statute to mean:

"* * * This does not of course mean that a club may on no occasion make a profit without losing its exemption, but it does mean that the returns from transactions with outsiders, taken by and large, shall be no more than a reimbursement of their cost to the club; shall not be a source of income. If it turns out upon computation that they are such a source over a substantial enough period to justify the conclusion that this is deliberate, we agree with the Board that the club is making earnings which 'inure to the benefit' of the members, though they are not distributed. * * *" (76 F2d at 598)

We find ourselves in the same position in the case

at bar as did the court in the *Jockey Club* case and which prompted it to observe: "What we need is a comparison between the income from the outside activities of the club, and their cost." (76 F2d at 598)

■ Tested by the foregoing principles, it becomes clear that the Association is not entitled to exemption under ORS 317.080(7). By the stipulation it is admitted that the Association's gross income, less its membership fees, exceeded its total expenditures in three of the four years in question. What we need to test the facts by the rule enunciated in the *Jockey Club* case is a comparison between the income from activities with nonmembers and their relative costs. No such comparison appears in the record. We do know that the total Clear Lake resort receipts between 1953 and 1956 averaged approximately $7,855.65 annually, and that the resort expenses during this same period were approximately $6,031.95 annually. But there are no figures showing the distribution between transactions with outsiders as opposed to the Association's dealings with its own members. The absence of this information represents a failure on the part of the Association to sustain the burden which a claim of tax exemption casts upon it.

The deficit between the total membership fees and expenditures was more than made up through sums received for entertainment and programs furnished at public and membership meetings and from profits from the operation of the Clear Lake resort. As we have before observed, the stipulation shows that a portion of the accumulated surplus realized from these functions was invested in a boat moorage and landing on the Alsea River for the use of its members, presumably to the exclusion of the general public. More-

over, it is admitted that members receive a substantial discount from the prices charged nonmembers for cabin and boat rentals at the Clear Lake resort. In the absence of testimony in explanation, these discounts given to members tend to demonstrate that the charges imposed on outsiders for the same services may well have been greater than required to reimburse the Association for the cost of rendering such services.

■ The record compels the conclusion that the net earnings from activities in which nonmembers participate inure to the benefit of the Association members in the form of improved facilities and services without a corresponding increase to them in dues or fees and, therefore, it is not entitled to exemption as a "club" as claimed under subsection (7) of ORS 317.080.

In addition to the *Pickwick* case, to which we have already alluded, the Association cites but one other federal decision in support of its immunity claim under subsection (7). We refer to *Koon Kreek Klub v. Thomas,* supra (108 F2d 616), wherein a fishing and hunting club owning a large game preserve granted grazing privileges on such land first for $500 per year, and later to its manager for $100 per year. The club also gave an oil lease on its property for $4 per acre rental from which no royalties were realized. The proceeds from these transactions were used to pay off a mortgage on the club's property. In holding the club exempt as a club, the court pointed out that whatever financial gain accrued from these transactions, it was merely *incidental* to the purposes upon which the exemption is based and all the income therefrom was applied exclusively toward accomplishing those purposes. The court then went on to *apparently* hold that the test for exemption was entirely depend-

ent upon the ultimate purpose for which the income was used, the source of the income being irrelevant.

■ Although the *Koon Kreek Klub* case would appear to be contrary to the position contended for by the Commission, it is not necessarily binding upon us unless its reasoning appears more cogent and persuasive than that found in the other federal decisions we have previously cited. See *Ruth Realty Co. v. Tax Commission,* 222 Or 290, 303, 353 P2d 524. *Koon Kreek Klub* is diametrically opposed in reasoning and results to the later decisions of the Tax Court and other federal courts. *Aviation Club of Utah,* supra, affirming 7 TC 377, and the *West Side Tennis Club,* supra, affirming 39 BTA 149. Both of these cases distinguish the *Koon Kreek Klub* case.

We adopt the reasoning found in the *Aviation Club of Utah* and *West Side Tennis Club* cases in reference to *Koon Kreek Klub.*

In essence petitioner's argument may be summarized as contending that its activities are exempt under ORS 317.080(6) as a "civic organization," and also under ORS 317.080(7) as a "club" and we should give consideration to both.

It is in the nature of a proposal to fragmentize the Association and from its civic organizational and welfare character, if so found, add thereto enough of its social club characteristics, of which there are many, and by such combination of the best of each, come up with a corporate hybrid which would qualify as tax exempt.

The foregoing statement finds support in the Association's concluding argument in its brief where it says: "The statutes provide for reasonable classification of organizations that are exempt. The activities

and purposes of the plaintiff in this case meet this reasonable classification test in two sections [sections (6) and (7)] of the statute [ORS 317.080]." But we decline to follow petitioner's thought in this respect because of its violent impact upon ORS 317.080 and destruction to the clear legislative intent.

In making such a representation plaintiff has misconceived the nature of the privilege granted by ORS 317.080.

■ ORS 317.080 does not exclude from the reach of state income tax any particular type of income, but tenders immunity by its terms to 14 distinctly different kinds of corporations or organizations which would normally be tax-paying entities from paying taxes upon items that otherwise would constitute taxable income. Each such entity is completely distinctive in character and purpose. In order to succeed the Association must show it is one of the particular kind of an organization which in itself is one of the 14 entities rendered exempt by ORS 317.080. It, therefore, follows that the Association must in fact demonstrate that it is wholly within one of the subsections of ORS 317.080 and not partly under one and partly under another. See *The Associates,* 28 BTA 521, 523 (1933); *Employes' Benefit Assn. of Amer. Steel Foundries,* 14 BTA 1166, 1183 (1929); *Oregon Methodist Homes, Inc. v. Horn,* supra (360 P2d at 297); *Allgemeiner Arbeiter Verein,* 25 TC 371, 375, affm'd 237 F2d 604 (3d Cir 1956). Obviously, the two subsections of ORS 317.080 can not be blended to serve plaintiff's purpose when the Association first describes itself as one "*exclusively* for promotion of social welfare" (subsection (6)) and later states it is "operated *exclusively* for pleasure, recreation" (subsection (7)). (Emphasis supplied.)

It is either exempt as a unit, without splitting itself, as the Association attempts to do here, or it is not exempt. There is no statutory authority, whatever the equities, permitting the exemption of any organization, however worthy, which can not fit itself within one of the various subdivisions of ORS 317.080. See *Allgemeiner Arbeiter Verein,* supra (25 TC at 374-376).

The situation in this case is almost identical to that existing in *Allgemeiner Arbeiter Verein,* supra, wherein petitioner attempted to gain exemption as a "club" under section 101(9) of the Internal Revenue Code of 1939 and/or as a "benevolent life insurance association" under section (10) of the same section. In denying such an exemption (a decision later affirmed by the Federal Third Circuit Court of Appeals) the Tax Court concluded its opinion as follows:

"Thus, petitioner is not an exempt organization under the provisions of section 101 (9), nor does it qualify for exemption under section 101 (10). In fact, counsel for petitioner does not seriously urge that petitioner falls wholly within either of the above two provisions. It is contended instead that, since of its two functions either alone would qualify an organization for exemption, the 'whole is equal to the sum of its parts,' and petitioner should therefore be held to be a tax-exempt entity. * * * The remedy, if any, must lie with Congress, and not in a tortured judicial application of the statute, however worthy the objective. The statute plainly sets forth various separate grounds for exemption. Petitioner must qualify under one of the paragraphs of section 101 in order to prevail. As an entity, it does not qualify under paragraph (9), nor does it satisfy the requirements of paragraph (10). There is nothing in the statute permitting the taxpayer to fragmentize itself and gain exemption piecemeal. It either falls within one of the exemption para-

graphs or it does not; and on the record before us we cannot hold that it satisfies the requirements of either (9) or (10), the only two paragraphs upon which it relies. * * *" (25 TC at 375-376)

For the foregoing reasons we hold that the petitioner Association is not a tax-exempt entity under either section (6) or section (7) of ORS 317.080.

Judgment reversed.